601 A.2d 633
OWENS–ILLINOIS, INC. et al.

v.

William ZENOBIA, Sr. et al.
No. 66, Sept. Term, 1991.
Court of Appeals of Maryland.
Feb. 14, 1992.
Reconsideration Denied March 11, 1992.*

* The addendum to this opinion denying Motion for Reconsideration can be found at 325 Md. 665 and 602 A.2d 1182.

422

424

Gardner M. Duvall (Harry S. Johnson, Patrick C. Smith, John G. Billmyre, Whiteford, Taylor & Preston, on brief, C. Robert Loskot (John G. Sakellaris, Bernstein, Sakellaris, & Ward, on brief), Baltimore, John J. Nagle, III, Margaret E. Swain, Barbara M. Gaughan, Power & Mosner, P.A., on brief), Towson, for petitioners/cross respondents.

Thomas V. Monahan, Jr., Toni–Jean Lisa, Goodell, DeVries, Leech & Gray of Baltimore, amicus for Maryland Ass'n of Defense Trial Counsel.

Gary I. Strausberg, Janet & Strausberg, Paul B. Bekman, Israelson, Salisbury, Clements & Bekman, Baltimore, amicus for Maryland Trial Lawyers' Ass'n.

Robert Dale Klein, Wharton, Levin & Ehrmantraut, Annapolis, Malcolm E. Wheeler, Parcel, Mauro, Hultin & Spaanstra, PC, Denver, Colo., amicus for Product Liability Advisory Council, Inc., Motor Vehicle Manufacturers Ass'n of the United States, Inc., Chamber of Commerce of the U.S., National Ass'n of Manufacturers of the U.S., Business Roundtable, and Chemical Manufacturers Ass'n.

Edward F. Houff, Carolyn J. Moses, Church & Houff, PA, Baltimore, amicus for Center for Claims Resolution.

James R. Eyler, John P. Sweeney, Gregory L. Lockwood Miles & Stockbridge, Baltimore, amicus for Owens–Corning Fiberglas Corp.

Clifford C. Cuniff, Baltimore, for respondents/cross petitioners.

Peter G. Angelos, Patricia J. Kasputys, Timothy J. Hogan, Law Offices of Peter G. Angelos, Baltimore, amicus for Law Offices of Peter G. Angelos.

Argued before MURPHY, C.J., ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

ELDRIDGE, Judge.

We issued a writ of certiorari in these cases to consider several important questions relating to a strict products

liability cause of action based on failure to warn of the dangerousness of the products, and to reconsider some of the principles governing awards of punitive damages in tort cases.

The plaintiffs Louis L. Dickerson and William L. Zenobia filed in the Circuit Court for Baltimore City separate complaints seeking damages for injuries resulting from exposure to asbestos, and the complaints were consolidated for purposes of trial and appeal. Both plaintiffs have pleural and parenchymal asbestosis. At the time of the trial, the plaintiffs abandoned all theories of liability except for strict liability under § 402A of the Restatement (Second) of Torts.

The plaintiff Dickerson sought damages from Owens–Illinois, Inc., Eagle–Picher Industries, Inc., and Celotex Corp., all of which manufactured products containing asbestos, and from MCIC, Inc., and Porter Hayden Company, both of which supplied and installed products containing asbestos. Dickerson claimed that he was exposed to asbestos from 1953 to 1963 when he worked as a laborer both at the shipyard and at the steel mill owned and operated by the Bethlehem Steel Corporation at Sparrows Point, Maryland.

The plaintiff Zenobia sought damages from the manufacturer Owens–Illinois, Inc., and the suppliers/installers MCIC, Inc., Porter Hayden Co. and Anchor Packing Co.[1] Zenobia alleged that he was exposed to asbestos while working as a painter for four months at the Bethlehem Steel Sparrows Point shipyard in 1948, while working as a pipe fitter for eighteen months at the Maryland Shipbuilding and Drydock shipyard in 1951 and 1952, and while employed as a cleanup man at the Carling Brewery for three months in 1968.

---

**1.** All other defendants named by both plaintiffs in the original complaints and subsequent amended complaints had either been granted summary judgment before the trial or had settled prior to or during the trial.

The jury awarded compensatory damages to the plaintiff Dickerson in the amount of $1,300,000 against all five defendants. In addition, the jury initially determined that punitive damages were warranted against certain defendants, and, subsequently the jury awarded punitive damages against Owens–Illinois in the amount of $235,000, against Porter Hayden in the amount of $2,500, and against Celotex in the amount of $372,000. The jury awarded to the plaintiff Zenobia compensatory damages in the amount of $1,200,000 against all four defendants; subsequently it awarded punitive damages against Owens–Illinois in the amount of $235,000 and against Porter Hayden in the amount of $2,500.

Pursuant to a stipulation, each of the defendants was deemed to have cross-claimed for contribution or indemnity against all other defendants prior to trial. Anchor Packing Co., a supplier and installer of products containing asbestos, sought in the *Zenobia* case indemnity against Raymark, Inc., a manufacturer, asserting that Raymark was Anchor's primary source of asbestos containing products. Raymark, Inc., had settled with both plaintiffs before trial. The cross-claims were tried separately, after the verdicts for the plaintiffs. At the time of the cross-claim trial, Raymark, Inc., was under the exclusive jurisdiction of the bankruptcy court. The circuit court granted the defendants' cross-claims for contribution against all settling defendants including Raymark, Inc. The compensatory damages verdicts were reduced proportionally in light of the releases between the plaintiffs and the settling defendants. In addition, the trial court held that Anchor Packing Co. was entitled to indemnity against Raymark, Inc., in the *Zenobia* case. Thus, because of the plaintiff Zenobia's settlement with and release of Raymark, the trial court struck the jury's award against Anchor Packing.

The compensatory and punitive damages awards were appealed to the Court of Special Appeals by Owens–Illinois, Inc., MCIC, Inc., Porter Hayden, Co., Eagle–Picher Indus-

tries, Inc., and Anchor Packing, Co.[2] The plaintiffs appeal-
ed from the cross-claim determinations. The Court of Spe-
cial Appeals affirmed all aspects of the awards for compen-
satory damages and affirmed the awards in the cross-claim
trial. The award of punitive damages against Owens–
Illinois was affirmed, and the award of punitive damages
against Porter Hayden was reversed. *See MCIC, Inc. v.
Zenobia,* 86 Md. App. 456, 587 A.2d 531 (1991).

Thereafter petitions and cross-petitions for a writ of
certiorari were filed in this Court. The only manufacturer
which filed a certiorari petition was Owens–Illinois. Ow-
ens–Illinois argued that it was entitled to a new trial
because certain depositions were improperly admitted into
evidence, and because the trial court gave an erroneous jury
instruction that Owens–Illinois had a duty to warn of the
hazards of asbestos after it had stopped manufacturing
products containing asbestos. Owens–Illinois also chal-
lenged the award of punitive damages. MCIC, Inc., and
Porter Hayden Co., which supplied and installed products
containing asbestos, also filed certiorari petitions which
raised a single issue, namely whether certain deposition
testimony was erroneously admitted against them.

The plaintiffs filed a conditional cross-petition for a writ
of certiorari, asking that the Court address the issues raised
in the cross-claims trial if the Court granted the defendants'
petitions. Specifically, the plaintiffs requested this Court to
decide whether the bankrupt debtor Raymark, Inc., can be
adjudicated a joint tortfeasor without leave of the bankrupt-
cy court. If so, the plaintiffs argued that Raymark was not
properly adjudicated a joint tortfeasor, and that, therefore,
contribution, as well as indemnity in favor of Anchor Pack-
ing Co., should not have been awarded with regard to
Raymark.

---

**2.** Before argument in the Court of Special Appeals, the defendants
Celotex Corp. and Eagle–Picher Industries, Inc., filed a bankruptcy
petition. All further proceedings in the cases against Eagle–Picher
Industries and Celotex Corp. were automatically stayed.

In response to the plaintiffs' conditional cross-petition for certiorari, the defendant Anchor Packing Co. filed a conditional cross-petition for certiorari. In the event that this Court granted the plaintiffs' conditional cross-petition, Anchor Packing Co. requested that the Court address the following contentions: (1) certain deposition testimony was erroneously admitted; (2) an instruction that Anchor had a continuing duty to warn of the hazards of asbestos after the plaintiffs' last exposure to asbestos containing products was improper; (3) the plaintiff Zenobia failed to show that the products which Anchor supplied and/or installed contained asbestos or that the plaintiff Zenobia was exposed to Anchor's products; and (4) because the verdict for compensatory damages was excessive and against the weight of the evidence, Anchor's motion for a new trial or remittitur should have been granted.

This Court granted all of the petitions and cross-petitions. Additional facts will be set forth in the particular parts of this opinion to which the facts relate.[3]

## I.

The defendants' initial argument is that certain deposition evidence should not have been admitted because it was irrelevant and because these defendants were not present at the depositions and thus were unable to cross examine the deponents.[4] The depositions were admitted into evidence

---

3. We note that there were numerous issues which were raised and decided in the Court of Special Appeals but which were not raised in this Court. For example, in the Court of Special Appeals all of the defendants now before this Court had argued that the evidence was insufficient to show that the defendants' activities were substantial factors in causing the plaintiffs' injuries. In this Court, the defendant Anchor Packing Co. is the only defendant raising this issue, and it asserted only that "Zenobia failed to prove that Anchor's product contained asbestos or that Zenobia was regularly or frequently exposed to respirable asbestos dust from an Anchor product." (Anchor's conditional cross-petition for a writ of certiorari, p. 16).

4. The defendants Anchor Packing Co., MCIC, Inc., Porter Hayden Company and Owens–Illinois object to the admission of the deposition

for the limited purpose of proving what the defendants should have known concerning the dangers of asbestos. Such knowledge is often referred to as "state of the art." The defendants do not argue that "state of the art" or an element of knowledge is not relevant in this strict liability case; rather they insist that these depositions, because they pertain to what other companies knew about asbestos, are not proper "state of the art" evidence. In order to resolve these arguments, it is necessary to discuss briefly why any element of knowledge is relevant in this strict liability case.

### A.

[1] Section 402A of the Restatement (Second) of Torts, adopted by this Court in *Phipps v. General Motors Corp.*, 278 Md. 337, 344, 363 A.2d 955, 958 (1976), requires that, in order to recover under a theory of strict liability, a plaintiff must show:

> "(1) [that] the product was in a defective condition at the time it left the possession or control of the seller,
>
> (2) that it was unreasonably dangerous to the user or consumer,
>
> (3) that the defect was a cause of the injuries, and
>
> (4) that the product was expected to and did reach the consumer without substantial change in its condition."

Thus, on its face, § 402A subjects a seller of a defective product to strict liability without regard to the knowledge of the defect and "even though [the seller] has exercised all possible care in the preparation and sale of the product." Restatement (Second) of Torts § 402A, Comment a (1965).

---

testimony of Dr. Mancuso. The defendant Owens–Illinois also objects to the admission of the deposition testimony of Mr. John Humphrey, Mr. Louis Pechstein and Dr. Kenneth Smith.

Dr. Mancuso is a medical doctor who served as an industrial hygiene consultant to the Philip Carey Co. (predecessor to Celotex Corp.) in 1962 and 1963. Mr. John Humphrey was President of the Philip Carey Co. from 1948 to 1967. Mr. Louis Pechstein was in charge of corporate records, claims and studies for the Philip Carey Co. from 1955 to 1979. Dr. Kenneth Smith was the medical director for Johns–Manville Corp. from 1944 to 1966.

When a product is alleged to be defective because of a failure to give an adequate warning, however, many courts have relied on Comment j of § 402A. Comment j explains that "the seller is required to give warning against [the danger], if he has knowledge, or by the application of reasonable, developed human skill and foresight should have knowledge, of the ... danger." The comment goes on to distinguish a product containing an adequate warning from a defective product, stating: "a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous." [5]

Several courts have acknowledged that the language in Comment j appears to contradict or create an exception to the basic rule set out in § 402A. *See, e.g., Woodill v. Parke Davis & Co.*, 79 Ill.2d 26, 37, 37 Ill.Dec. 304, 310, 402 N.E.2d 194, 200 (1980); *Little v. PPG Industries, Inc.*, 19 Wash. App. 812, 821–822, 579 P.2d 940, 946–947 (1978), *modified on other grounds*, 92 Wash.2d 118, 594 P.2d 911 (1979). Nevertheless, the majority of courts which have considered a failure to warn case in the context of strict liability have either expressly or implicitly held that a manufacturer of a product, which is defective only because of the lack of an adequate warning, is not liable when the failure to warn resulted from an absence of knowledge of the dangerous quality of that product.

Moreover, the courts reason, the presence of the required knowledge can be established by evidence that the dangerous quality of the product should have been known by a manufacturer because it was known in the scientific or expert community. As Judge John Minor Wisdom stated for the court in another case involving a claimed injury from asbestos, *Borel v. Fibreboard Paper Products Corpo-*

---

**5.** Those jurisdiction which hold that evidence of knowledge of dangerous quality is relevant in a failure to warn case, do not regard lack of knowledge as a factor in a strict liability design defect case. *See* C. Marvel, Annotation, *Strict Products Liability: Liability for Failure to Warn as Dependent on Defendant's Knowledge of Danger*, 33 A.L.R. 4th 368, 378 n. 14 (1984).

*ration,* 493 F.2d 1076, 1089 (5th Cir.1973), *cert. denied,* 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974),

"in cases such as the instant case, the manufacturer is held to the knowledge and skill of an expert. This is relevant in determining (1) whether the manufacturer knew or should have known the danger.... The manufacturer's status as expert means that at a minimum he must keep abreast of scientific knowledge, discoveries, and advances and is presumed to know what is imparted thereby."

The same point was made by the United States Court of Appeals for the Fourth Circuit in *Lohrmann v. Pittsburgh Corning Corp.,* 782 F.2d 1156, 1164 (4th Cir.1986):

"Industry standards and state of the art are not synonymous. State of the art includes all of the available knowledge on a subject at a given time, and this includes scientific, medical, engineering, and any other knowledge that may be available. State of the art includes the element of time: What is known and when was this knowledge available."

*See, e.g., Hardy v. Johns–Manville Sales Corp.,* 681 F.2d 334, 344 (5th Cir.1982); *Gordon v. Niagara Mach. & Tool Works,* 574 F.2d 1182, 1190 (5th Cir.1978); *Shell Oil Co. v. Gutierrez,* 119 Ariz. 426, 434, 581 P.2d 271, 279 (1978); *Oakes v. Geigy Agricultural Chemicals,* 272 Cal.App. 2d 645, 651, 77 Cal. Rptr. 709, 713 (3d Dist.1969); *Woodill v. Parke Davis & Co., supra,* 79 Ill.2d at 37, 37 Ill.Dec. at 308, 402 N.E.2d at 198; *Smith v. E.R. Squibb & Sons, Inc.,* 405 Mich. 79, 90, 273 N.W.2d 476, 480 (1979); *McKee v. Moore,* 648 P.2d 21 (Okla.1982); *Cochran v. Brooke,* 243 Or. 89, 94–96, 409 P.2d 904, 906–907 (1966). *See also* C. Marvel, Annotation, *Strict Products Liability: Liability for Failure to Warn as Dependent on Defendant's Knowledge of Danger,* 33 A.L.R.4th 368 (1984), and cases cited therein.[6]

---

**6.** For two competing views on the desirability of allowing a knowledge component in a strict liability case, *see* W. Murray, Jr., *Requiring Omniscience: The Duty to Warn of Scientifically Undiscoverable Prod-*

As previously indicated, this evidence concerning the presence or absence of knowledge in the expert community is called "state of the art" evidence.

Consequently, in a failure to warn case governed by the Restatement § 402A and Comment j, negligence concepts to some extent have been grafted onto strict liability. In such cases, a majority of courts hold that an element of knowledge or "state of the art" evidence is directly pertinent to a cause of action under § 402A of the Restatement (Second) of Torts, and liability is no longer entirely "strict." [7]

On the other hand, a few courts have held that neither the defendant's actual knowledge nor evidence of scientific knowledge about the dangerous characteristics of the product is relevant in a strict liability failure to warn case. *Elmore v. Owens–Illinois, Inc.*, 673 S.W.2d 434, 436–439 (Mo.1984); *Beshada v. Johns–Manville Products Corp.*, 90 N.J. 191, 202–208, 447 A.2d 539, 545–549 (1982); *Kisor v. Johns–Manville Corp.*, 783 F.2d 1337, 1340–1342 (9th Cir. 1986) (applying Washington law).

Before the trial in the present cases the plaintiffs asserted that evidence of knowledge should not be relevant with

---

*uct Defects,* 71 Geo.L.J. 1635, 1638 n. 21 (1983); J. Martineau, *The Duty to Warn Under Strict Products Liability as Limited by the Knowledge Requirement: A Regretful Retention of Negligence Concepts,* 26 St. Louis U.L.J. 125 (1981).

**7.** Professors Henderson and Twerski argue that the difference between strict liability and negligence in a failure to warn case is entirely semantic and unnecessarily confusing. They suggest that since courts apply negligence concepts in all failure to warn cases, all such cases sound in negligence. J. Henderson and A. Twerski, *Doctrinal Collapse in Products Liability: The Empty Shell of Failure to Warn,* 65 N.Y.U.L.Rev. 265 (1990).

We note that despite the overlap of negligence principles in a strict liability failure to warn case, strict liability differs from a negligence cause of action in that contributory negligence is not a defense to a strict liability claim. *Ellsworth v. Sherne Lingerie, Inc.,* 303 Md. 581, 597–598, 495 A.2d 348, 356–357 (1985). In addition, in light of the other comments to § 402A of the Restatement (Second) of Torts, which apply in defective design, defective construction, and failure to warn cases, there are some differences between a negligent failure to warn case and a failure to warn based upon § 402A and Comment j.

regard to their strict liability claims. The defendants, however, argued that the plaintiffs were required to produce "state of the art" evidence as part of their case. The trial judge, apparently relying on a prior ruling in another case by Judge Levin for the Circuit Court for Baltimore City, agreed with the defendants and required that the plaintiffs introduce "state of the art" evidence. Consequently, at trial the plaintiffs introduced evidence designed to show the requisite knowledge or "state of the art." Moreover, neither side in the Court of Special Appeals or before this Court challenged the trial court's ruling that a knowledge component or "state of the art" is pertinent in a strict liability failure to warn case.

The United States Court of Appeals for the Fourth Circuit, applying Maryland law, has held that in a strict liability failure to warn case, "state of the art" is relevant with regard to the defendant's liability. *See Lohrmann v. Pittsburgh Corning Corp., supra,* 782 F.2d at 1164 ("in Maryland, state of the art can be considered in a strict liability tort case where the claimed defect is a failure to warn"). The federal Court of Appeals reasoned that in *Phipps v. General Motors Corp., supra,* this Court "adopted strict liability in tort as expressed in § 402A of the Restatement (Second) of Torts," that Comment j is part of § 402A, and that

> "[t]he language of Comment (j) is state-of-the-art language because it requires the seller to give a warning if he has knowledge, 'or by the application of reasonable, developed human skill and foresight should have knowledge' of the danger."

*Lohrmann v. Pittsburgh Corning Corp., supra,* 782 F.2d at 1164–1165.

While this Court has not previously dealt with this issue, we agree that our adoption of § 402A in the *Phipps* case included Comment j and the knowledge component provided for in Comment j. The *Phipps* opinion expressly indicated that our adoption of § 402A included the official comments (278 Md. at 346, 363 A.2d at 959–960):

"Under § 402A, various defenses are still available to the seller in an action based on strict liability in tort. These defenses are set forth and explained in the official comments following § 402A."

Moreover, in *Phipps* we discussed with approval several of the official comments, including Comment j. *Ibid.* In addition, as pointed out by the court in *Lohrmann*, 782 F.2d at 1164, the *Phipps* opinion went on to state that "[d]espite the use of the term 'strict liability' the seller is not an insurer, as absolute liability is not imposed on the seller for any injury resulting from the use of his product." 278 Md. at 351–352, 363 A.2d at 963. *See also Miles Laboratories v. Doe*, 315 Md. 704, 724, 556 A.2d 1107, 1117 (1989) ("[o]ur adoption of § 402A in *Phipps* ... implicitly adopted the substance of Comment k"); *Ellsworth v. Sherne Lingerie, Inc.*, 303 Md. 581, 591–592, 495 A.2d 348, 353 (1985) (to the same effect with respect to Comment g of § 402A).

■■■ We hold that Comment j of § 402A is applicable to a strict liability cause of action where the alleged defect is a failure to give adequate warnings. Therefore, the seller is not strictly liable for failure to warn unless the seller has "knowledge, or by the application of reasonable, developed human skill and foresight should have knowledge, of the presence of the ... danger." Restatement (Second) of Torts § 402A, Comment j. Moreover, we agree with the numerous cases holding that, for purposes of the "should have knowledge" component of comment j, a manufacturer of a product is held to the knowledge of an expert in the field. *See Babylon v. Scruton*, 215 Md. 299, 304, 138 A.2d 375, 378 (1958), quoting 2 Harper & James, *The Law of Torts* § 28.4 (negligence case pointing out that " 'a person who undertakes such manufacturing will be held to the skill of an expert in that business and to an expert's knowledge of the arts, materials, and processes. Thus he must keep reasonably abreast of scientific knowledge and discoveries

touching his product . . .' ").[8]

## B.

As previously stated, the defendants argue that the deposition evidence was inadmissible because (1) they were not present at the depositions and did not have the opportunity to cross examine the deponents, and (2) this deposition evidence, pertaining to what other asbestos manufacturers knew about the dangers of asbestos, is not proper "state of the art" evidence. We shall first address the requirements of Maryland Rule 2–419 and the former testimony exception

---

8. It is not entirely clear whether the knowledge or state of the art component in a strict liability failure to warn case is an element to be proven by the plaintiff or is an affirmative defense. *Cf. Ellsworth v. Sherne Lingerie, Inc., supra,* 303 Md. at 592–596, 495 A.2d at 353–356 (discussing whether "misuse" of a product is a part of the plaintiff's case or an affirmative defense).

Prosser and Keeton take the position that a plaintiff who seeks to recover in a strict liability failure to warn case must show that the defendant knew or should have known of the hazard about which he failed to warn. Prosser and Keeton, *Torts* § 99, at 697 (5th ed. 1984). *See also* M. Madden, *Products Liability* § 10.3, at 377–378 (2d ed. 1988). On the other hand, an American Law Reports Annotation collecting cases concerning strict liability for failure to warn seems to assert that the absence of knowledge of the danger is an affirmative defense which must be proven by the defendant. C. Marvel, Annotation, *Strict Products Liability: Liability For Failure to Warn as Dependent on Defendant's Knowledge of Danger, supra,* 33 A.L.R. 4th 368, and cases cited therein. Many cases also refer to the knowledge component in a strict liability failure to warn case as a "defense."

It is not necessary for us to decide in this case whether the knowledge component is an element of the plaintiff's case or an affirmative defense because neither the plaintiffs nor the defendants have raised any issue in this regard. Nevertheless, we agree with those authorities, and with the Circuit Court for Baltimore City, that the knowledge or state of the art component is an element to be proven by the plaintiff. In a strict liability failure to warn case, the alleged defect is the failure of the seller to give an adequate warning. The seller, however, need not give any warning if the requisite state of the art or knowledge does not require it. Thus, where a product lacks a warning because of insufficient knowledge on the part of the manufacturer or in the scientific field involved, the product is not defective. As defectiveness is an element to be proven by the plaintiff, the knowledge or state of the art component is not an affirmative

to the hearsay rule, and then discuss the admissibility of the depositions on relevance grounds.

## 1.

■ The defendants argue that the deposition testimony should not have been admitted because they were not present at the depositions and did not have an opportunity to cross examine the witnesses. The defendant suppliers/installers Anchor Packing Co., Porter Hayden and MCIC, Inc., were not present at the deposition of Dr. Mancuso, nor were any other non-manufacturing suppliers/installers of asbestos. Several manufacturers, however, were present at this deposition, including Owens–Illinois. Similarly, although Owens–Illinois was not present, several defendant manufacturers attended the depositions of Dr. Smith, Mr. Pechstein and Mr. Humphrey.

Depositions meeting the requirements of Maryland Rule 2–419 may be admissible under the former testimony exception to the rule against hearsay.[9] In *Huffington v. State*, 304 Md. 559, 569–574, 500 A.2d 272, 277–279 (majority opinion), 304 Md. at 597, 500 A.2d at 291 (dissenting opinion) (1985), *cert. denied*, 478 U.S. 1023, 106 S.Ct. 3315, 92 L.Ed.2d 745 (1986), we endorsed the substance of Federal Rule of Evidence 804(b)(1) as the test for the admissibility

---

defense. *See Ellsworth v. Sherne Lingerie, Inc., supra,* 303 Md. at 597, 495 A.2d at 356.

**9.** Maryland Rule 2–419(a)(3)(C) provides that deposition testimony may be used when the deponent is unavailable. Rule 2–419(c) further provides:

> **"Deposition Taken in Another Action.**—A deposition lawfully taken in another action may be used like any other deposition if the other action was brought in any court of this State, of any other state, or of the United States, involved the same subject matter, and was brought between the same parties or their representatives or predecessors in interest."

Although Rule 2–419(c) applies only when the deponent is unavailable, the Court of Special Appeals held that because the defendants did not object to the depositions on this ground, they had waived the objection. No party has challenged before us this ruling by the Court of Special Appeals.

of former testimony.[10] *See also Grandison v. State,* 305 Md. 685, 734–735, 506 A.2d 580, 609–610, *cert. denied,* 479 U.S. 873, 107 S.Ct. 38, 93 L.Ed.2d 174 (1986).

The United States Court of Appeals for the Sixth Circuit in *Clay v. Johns–Manville Sales Corp.,* 722 F.2d 1289, 1295 (6th Cir.1983), *cert. denied,* 467 U.S. 1253, 104 S.Ct. 3537, 82 L.Ed.2d 842 (1984), quoting Weinstein & Berger, *Evidence* § 804(b)(1)[04], at 804–67 (1969), noted that " 'cases decided since the enactment of 804(b)(1) for the most part indicate a reluctance to interpret "predecessor in interest" in its old, narrow, and substantive law sense, of privity.' " Accordingly, the court explained the former testimony hearsay exception contained in 804(b)(1) as follows (*Ibid.,* quoting *Lloyd v. American Export Lines, Inc.,* 580 F.2d 1179, 1187 (3d Cir.), *cert. denied,* 439 U.S. 969, 99 S.Ct. 461, 58 L.Ed.2d 428 (1978)):

> " 'if it appears that in the former suit a party having a like motive to cross-examine about the same matters as the present party would have, was accorded an adequate opportunity for such examination, the testimony may be received against the present party.' Under these circumstances, the previous party having like motive to develop the testimony about the same material facts is, in the final analysis, a predecessor in interest to the present party."

■ Thus, a "predecessor in interest" for the purposes of this rule is interpreted to include any party with a similar motive to develop the testimony. Privity between the two parties is no longer required. Deposition testimony is admissible if some other party, present at the deposition, had

---

**10.** Federal Rule of Evidence 804(b)(1) provides:

> "**Former Testimony.** Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination."

the same opportunity and similar motive to develop the testimony as the party against whom the deposition is offered. *Clay v. Johns–Manville Sales Corp., supra,* 722 F.2d at 1294–1295; *Hendrix v. Raybestos–Manhattan, Inc.,* 776 F.2d 1492, 1505 (11th Cir.1985); *Dartez v. Fibreboard Corp.,* 765 F.2d 456, 462–463 (5th Cir.1985). As we have expressly adopted the substance of Federal Rule of Evidence 804(b)(1), we agree that "[m]otive to develop the testimony, [rather than privity between the parties], is the key factor" in assessing whether the parties present at the deposition are predecessors in interest for purposes of Maryland Rule 2–419(c). J. Murphy, *Maryland Evidence Handbook* § 802(D), at 259 (1989).

In deciding whether the deposition testimony was properly admitted in these cases, we shall first address the principal argument of the defendant suppliers/installers as to why the deposition of Dr. Mancuso was improperly admitted against them. They argue that their interests were not adequately protected by the presence of the manufacturers at the Dr. Mancuso deposition because manufacturers of asbestos would not have the same motive to develop certain testimony as a supplier/installer would. Therefore, the argument continues, the manufacturers were not the predecessors in interest of suppliers/installers. In fact, the suppliers/installers argue, their interests conflict with the interests of the manufacturers in this litigation.

■ The depositions were admitted for the limited purpose of proving "state of the art." As earlier explained, state of the art evidence is directly relevant to whether a product was defective when it was sold by a manufacturer. In a strict liability action, if a product is defective when it was sold by a manufacturer because it lacked a warning of its dangerous characteristics, although it should have had such a warning in light of the state of the art, and if the defective and dangerous product reaches the user plaintiff without substantial change, middlemen or intermediate sellers of the defective product are strictly liable to the plaintiff user just as the manufacturer is liable to the plaintiff.

Restatement (Second) of Torts § 402A, Comment f; *Eaton Corp. v. Wright*, 281 Md. 80, 88–90, 375 A.2d 1122, 1126–1127 (1977). This principle, at least at the present stage of the law's development, is fully applicable in a strict liability failure to warn case. Prosser and Keeton explain as follows (Prosser and Keeton, *Torts* § 99, at 697 (5th ed. 1984), emphasis added):

"It is commonly said that a product can be defective in the kind of way that makes it unreasonably dangerous by failing to warn or failing adequately to warn about a risk or hazard related to the way a product is designed. But notwithstanding what a few courts have said, a claimant who seeks recovery on this basis must, according to the generally accepted view, prove that the manufacturer-designer was negligent. There will be no liability without a showing that the defendant designer knew or should have known in the exercise of ordinary care of the risk or hazard about which he failed to warn....

"There is one aspect of this so-called strict liability in addition to the matter of defenses and limitations on liability that distinguish it from negligence liability. *When a manufacturer or assembler markets without adequate warnings, a reseller is subject to liability without negligence in reselling the product without adequate warning. Thus, all those in the marketing chain subsequent to a sale by the manufacturer are liable without negligence for the negligence of the manufacturer in failing to warn or adequately to warn.*"

*See also Nissen Corp. v. Miller*, 323 Md. 613, 624, 594 A.2d 564, 569 (1991) ("It is clear that Maryland espoused the doctrine of strict liability in tort in order to relieve plaintiffs of the burden of proving specific acts of negligence ... where plaintiffs can prove a product is defective and unreasonably dangerous *when placed in the stream of commerce* ") (emphasis added). Consequently, with respect to the strict liability claim of a plaintiff, intermediate sellers such as the suppliers/installers in the present case have the same interest as the manufacturers in attempting to show

that the state of the art did not require a warning and that, therefore, the product was not defective under the principles of § 402A, Comment j, of the Restatement (Second) of Torts.[11]

■ The defendant Owens–Illinois has even less cause to complain about the admission of depositions under Maryland Rule 2–419(c). A defendant manufacturer was present at each of the depositions admitted against Owens–Illinois. Owens–Illinois clearly is held to the same "state of the art" standard as those defendants present at the depositions. The defendants at the depositions are predecessors in interest to Owens–Illinois because they had the same opportunity to develop the testimony. Therefore, these depositions fall within the former testimony exception to the rule

---

**11.** The supplier/installers in the present case disagree that, with respect to the strict liability claims of the plaintiffs, the suppliers/installers and the manufacturers have the same interests concerning a deposition on state of the art. The supplier/installers argue that, whereas a manufacturer may be strictly liable to the plaintiffs if the product failed to contain warnings which were dictated by the state of the art, an intermediate supplier of the same product is not strictly liable to the plaintiffs unless he knew or, based on information actually given to him, should have known that a warning was required. While there might be merit in this argument if the plaintiffs' cause of action were based on negligence, as pointed out above the argument is inconsistent with the principles of strict liability under § 402A of the Restatement even as modified by Comment j. Furthermore, the defendants cite no cases, and we are aware of none, supporting the defendants' view of an intermediate seller's liability to a plaintiff in a strict liability cause of action.

We would agree that there is a circumstance when the interests of a supplier/installer and a manufacturer would not be the same in examining a deponent such as Dr. Mancuso. To the extent that the deposition might relate to an indemnity claim by the supplier/installer against the manufacturer, it would be to the supplier/installer's benefit to elicit testimony that, whereas expert medical and scientific information existed so as to warrant a warning by manufacturers, such information was not generally known outside the scientific community and would not have been readily available to non-manufacturing suppliers/installers. In the instant cases, however, the defendant suppliers/installers complain solely about the admission of the Dr. Mancuso deposition at the trial of the plaintiffs' claims. They have made no complaint about the evidence at the separate cross-claims trial.

against hearsay and are admissible against Owens–Illinois under Rule 2–419(c).

## 2.

We now turn to the defendants' argument that these depositions should not have been admitted because they do not address what was known to the expert, medical or scientific community but, rather, address what other asbestos manufacturing companies knew. As previously stated, all manufacturers are held to the knowledge and skill of an expert. *Borel v. Fibreboard Paper Products Corporation, supra,* 493 F.2d at 1089. The defendants' argument that this expert testimony is irrelevant because it relates only to what individual companies discovered, "reflects a misunderstanding of a critical issue in any product liability action: the state of the art pertaining to any possible risks associated with the product." *Dartez v. Fibreboard Corp., supra,* 765 F.2d at 461.

The United States Court of Appeals for the Fifth Circuit considered this argument in an identical context in *Dartez v. Fibreboard Corp., supra.* That court determined that similar deposition evidence was relevant to the state of the art element of a products liability case, explaining (*Ibid.*) (emphasis added):

> "Dartez was required to establish that the dangers of asbestos were reasonably foreseeable or scientifically discoverable at the time of his exposure before these defendants could be found liable.... *Borel* holds all manufacturers to the knowledge and skill of an expert. They are obliged to keep abreast of any scientific discoveries and are presumed to know the results of all such advances. Moreover, they each bear the duty to fully test their products to uncover all scientifically discoverable dangers before the products are sold.... The actual knowledge of an individual manufacturer is not the issue."

*Accord Clay v. Johns–Manville Sales Corp., supra,* 722 F.2d at 1294–1295.

We agree with the United States Courts of Appeal for the Fifth and Sixth Circuits that deposition evidence concerning what scientific and medical experts in the field knew about the dangers of asbestos is relevant to the plaintiff's attempt to prove state of the art. Such expert evidence is not irrelevant merely because these experts were employed by private companies. Because manufacturers are held to the standards and knowledge of an expert, this evidence is relevant to show what was scientifically and medically available and discoverable by other experts in the field.

Moreover, " 'the admissibility of expert testimony is a matter largely within the discretion of the trial court, and its action in admitting or excluding such testimony will seldom constitute a ground for reversal.' " *Bloodsworth v. State*, 307 Md. 164, 185–186, 512 A.2d 1056, 1067 (1986), quoting *Raithel v. State*, 280 Md. 291, 301, 372 A.2d 1069, 1074–1075 (1977). Here, the deposition evidence included statements concerning the availability of published scientific and medical data about the dangers of asbestos exposure in addition to statements about the results of experiments conducted by experts on behalf of the Johns–Manville and Philip Carey Companies.

Furthermore, even if the admission of the depositions were an abuse of discretion, the defendants have not shown that the error was prejudicial. The live testimony of Dr. Schepers in large part duplicated the state of the art evidence in the depositions. Dr. Schepers testified that in 1930 there were approximately fifty medical articles concerning the dangers of asbestos and that by 1960 there were "nearly a thousand" such articles. Dr. Schepers further testified about experiments which he conducted with asbestos containing products on behalf of Owens–Illinois.

In light of the nature of the deposition testimony and the additional state of the art testimony by Dr. Schepers, the defendants have not shown that the admission of these depositions constituted reversible error.

## II.

■ The defendant Owens–Illinois contends that the trial court should not have instructed the jury that the duty to warn continues after the defendant stops manufacturing or selling products containing asbestos. The instruction only applied to the *Zenobia* case. The plaintiff Zenobia had argued that because he was a smoker and smoking aggravated the development of asbestosis, a post-exposure warning from Owens–Illinois would have prevented the aggravation of his disease. Owens–Illinois stopped manufacturing asbestos in 1958. Owens–Illinois' argument is not that, under the particular facts of this case, it was not required to give a warning after 1958. Instead, Owens–Illinois argues that, as a matter of law, a manufacturer has no duty whatsoever to warn after it stops manufacturing the product.

■ Generally, a manufacturer of a defective product has a duty to warn of product defects which the manufacturer discovers after the time of sale. As this Court stated in *Rekab, Inc. v. Frank Hrubetz & Co.*, 261 Md. 141, 146, 274 A.2d 107, 110 (1971), quoting 1 Frumer and Friedman, *Products Liability* § 8.02, at 148.3, " '[e]ven if there is no duty to warn at the time of the sale, facts may thereafter come to the attention of the manufacturer which make it imperative that a warning then be given.' " *See, e.g., LaBelle v. McCauley Ind. Corp.*, 649 F.2d 46, 48–49 (1st Cir.1981); *Fell v. Kewanee Farm Equipment Co.*, 457 N.W.2d 911, 920 (Iowa 1990); *Comstock v. General Motors Corp.*, 358 Mich. 163, 176, 99 N.W.2d 627, 634 (1959); *Feldman v. Lederle Laboratories*, 125 N.J. 117, 144, 592 A.2d 1176, 1190 (1991) ("a manufacturer is obligated to communicate a warning based on subsequently-acquired knowledge of the danger as soon as reasonably foreseeable"); *Smith v. Selco Products, Inc.*, 96 N.C.App. 151, 158, 385 S.E.2d 173, 176–177 (1989), *review denied*, 326 N.C. 598, 393 S.E.2d 883 (1990) ("A manufacturer does not completely discharge its duty to warn simply by providing some warnings of some dangerous propensity of its product at the

time of sale. A continuing duty exists to provide post-sale warnings of any deficiencies it learns exist in the product"). Therefore, if a manufacturer discovers a product defect after the time of sale, the manufacturer must make reasonable efforts to issue a post-sale warning. *Rekab, Inc. v. Frank Hrubetz & Co., supra,* 261 Md. at 147, 274 A.2d at 111, quoting *Levin v. Walter Kidde & Co., Inc.,* 251 Md. 560, 564, 248 A.2d 151, 154 (1968) ("The duty owed is a reasonable warning"). *See also Comstock v. General Motors Corp., supra,* 358 Mich. at 176, 99 N.W.2d at 634 (General Motors had a duty to "take all reasonable means to convey effective warning").

Owens–Illinois does not argue that *Rekab, Inc. v. Frank Hrubetz & Co., supra,* was wrongly decided. In fact Owens–Illinois acknowledges its continuing duty to warn of defects. Nonetheless, it contends that, as a matter of law, its continuing duty to warn ceased when it stopped manufacturing asbestos products in 1958. Owens–Illinois relies on the assertion that "state of the art" information about the hazards of asbestos was no longer available to it after 1958. Alternatively, Owens–Illinois contends that even if it had known of the hazards of asbestos after 1958, it had no reasonable means of communicating a warning to the users of its products, including the plaintiff Zenobia.

We cannot agree with Owens–Illinois' reasoning.[12] As previously stated, the post-sale duty to warn requires reasonable efforts to inform users of the hazard once the manufacturer is or should be aware of the need for a warning. Owens–Illinois was not precluded from showing that it did not become aware of the need for a warning or

---

**12.** The defendant Anchor Packing Co., Inc., makes a similar argument based on the fact that the plaintiff Zenobia was not exposed to asbestos products supplied by Anchor after 1953. Anchor argues that because Zenobia was no longer a user of the product, no reasonable effort to warn would have reached him. Our rejection of Owens–Illinois' continuing duty to warn argument also applies to Anchor Packing Co.'s argument.

that, in light of the fact that it no longer manufactured the product, it made reasonable efforts to warn.

The Supreme Court of Washington addressed this issue in *Lockwood v. AC & S, Inc.*, 109 Wash.2d 235, 744 P.2d 605 (1987). The plaintiff Lockwood had asbestosis as a result of his exposure to a Raymark Industries product. Raymark argued that documents revealing what it knew about the hazards of asbestos after 1972 were irrelevant because Lockwood's last exposure preceded 1972. The court rejected this argument, stating (109 Wash.2d at 260, 744 P.2d at 691):

> "[W]e believe that if Raymark had made a reasonable effort to provide Lockwood with the information it acquired about the dangers of asbestos exposure after his retirement, the seriousness of his injury might have been reduced. Under those circumstances, Raymark had a continuing duty to warn Lockwood of the known dangers of its product after he was no longer exposed to it."

The court cautioned that the "warning should be required to the extent practicable" under the circumstances.

■■■ The fact that a manufacturer or seller has discontinued its asbestos product line, and the fact that the plaintiff was no longer exposed to its product, are not circumstances which should necessarily relieve the seller of its duty to warn. Rather, these factors are relevant to a determination of what reasonable efforts to discover the danger and to warn are required.[13] A seller is not entitled to automatic relief from its continuing duty to warn merely because it no longer manufacturers a defective product.

---

13. *See* V. Schwartz, *The Post–Sale Duty to Warn: Two Unfortunate Forks in the Road to a Reasonable Doctrine,* 58 N.Y.U.L.Rev. 892, 896 (1983):

"[T]he facts of a particular case, such as the gravity and likelihood of harm, the number of persons affected, and the economic cost and practical problems associated with identifying and contacting current product users, should all be relevant in determining whether a manufacturer has satisfactorily discharged a post-sale duty to warn."

### III.

The defendant Anchor Packing Co. makes two additional arguments. It asserts that because the verdict for compensatory damages was excessive in the *Zenobia* case, the trial court should have granted its motion for new trial or for remittitur. In addition, it argues that the plaintiff Zenobia failed to show that the products which Anchor Packing Co. supplied or installed contained asbestos or that Zenobia was exposed to Anchor Packing Co.'s products. The record in the *Zenobia* case does not support Anchor Packing Co.'s arguments.

The granting or denial of a motion for new trial based upon the excessiveness of damages or a motion for remittitur is within the discretion of the trial court. As stated by this Court in *Banegura v. Taylor*, 312 Md. 609, 624, 541 A.2d 969, 976 (1988), quoting *Kirkpatrick v. Zimmerman*, 257 Md. 215, 218, 262 A.2d 531, 532 (1970):

"[A]n abuse of that discretion may be reviewed by an appellate court ... but ... '[w]e know of no case where this Court has ever disturbed the exercise of the lower court's discretion in denying a motion for [a] new trial because of the inadequacy or excessiveness of [compensatory] damages.' "

The plaintiff Zenobia produced medical evidence that showed that his injuries are permanent and progressive. We cannot say that the trial court abused its discretion in refusing to grant Anchor Packing Co.'s motion for new trial or remittitur.

With respect to Anchor Packing Co.'s second argument that the plaintiff Zenobia failed to show that he was exposed to products which contained asbestos supplied by Anchor Packing Co., it is simply not supported by the factual record in this case. The plaintiff Zenobia testified that he had handled gaskets used on high temperature steam lines bearing the label "Anchor Packing" while working at the Maryland Shipbuilding and Drydock. He testified that he cut and hammered these products supplied by

Anchor Packing Co. and that these products generated dust. Furthermore, Anchor Packing Co. admitted to selling gaskets containing asbestos designed for high temperature steam lines. This testimony undercuts Anchor Packing Co.'s argument that Zenobia failed to prove that he was exposed to Anchor Packing Co.'s asbestos containing products.

## IV.

In granting the petitions for a writ of certiorari in these cases, this Court issued an order requesting that the briefs and argument encompass the following issue:

"In light of the concurring opinion of Judges Eldridge, Chasanow, and Cole in *Schaefer v. Miller,* 322 Md. 297, 312–332, 587 A.2d 491 (1991), what should be the correct standard under Maryland law for the allowance of punitive damages in negligence and products liability cases, *i.e.,* gross negligence, actual malice, or some other standard. *See, e.g., Smith v. Gray Concrete Pipe Co.,* 267 Md. 149, 297 A.2d 721 (1972); *Davis v. Gordon,* 183 Md. 129, 36 A.2d 699 (1944)."

*See* Maryland Rule 8–131(b).

As noted in the opinion of Judges Eldridge, Cole and Chasanow in *Schaefer v. Miller, supra,* 322 Md. at 312–332, 587 A.2d at 498–509, in recent years there has been a proliferation of claims for punitive damages in tort cases, and awards of punitive damages have often been extremely high. *See* 2 J. Ghiardi and J. Kircher, *Punitive Damages Law and Practice* § 21.01, at 2 (1985); D. Owen, *Problems in Assessing Punitive Damages Against Manufacturers of Defective Products,* 49 U.Chi.L.Rev. 1, 6 (1982) ("Large assessments of punitive damages may not yet be a major threat to the continued viability of most manufacturing concerns, but the increasing number and size of such awards may fairly raise concern for the future stability of American industry"); M. Peterson, S. Sarma, M. Shanley, *Punitive Damages,* (Rand, The Institute for Civil Justice, 1987); J. Sales and K. Cole, *Punitive Damages: A Relic*

*That Has Outlived Its Origins,* 37 Vand.L.Rev. 1117, 1154 (1984) ("the amount of punitive damages awarded in recent years ... has escalated to astronomical figures that boggle the mind"). *But see* S. Daniels and J. Martin, *Myth and Reality in Punitive Damages,* 75 Minn.L.Rev. 1 (1990).

Accompanying this increase in punitive damages claims, awards and amounts of awards, is renewed criticism of the concept of punitive damages in a tort system designed primarily to compensate injured parties for harm. *See, e.g.,* E. Elliott, *Why Punitive Damages Don't Deter Corporate Misconduct Effectively,* 40 Ala.L.Rev. 1053 (1989); *Pacific Mutual Life Ins. Co. v. Haslip,* —— U.S. ——, ——, 111 S.Ct. 1032, 1043, 113 L.Ed.2d 1, 20 (1991). In Maryland the criticism has been partly fueled and justified because juries are provided with imprecise and uncertain characterizations of the type of conduct which will expose a defendant to a potential award of punitive damages. Accordingly, we shall (1) examine these characterizations of a defendant's conduct in light of the historic objectives of punitive damages, (2) more precisely define the nature of conduct potentially subject to a punitive damages award in non-intentional tort cases, and (3) heighten the standard of proof required of a plaintiff seeking an award of punitive damages.

These cases, along with two others heard by us on the same day,[14] directly raise the problem of what basic standard of wrongful conduct should be used for the allowance of punitive damages in negligence actions generally, and in products liability actions based on either negligence or on strict liability. The jury in these cases received the following instruction on punitive damages:

"Implied malice, which the plaintiffs have to prove in order to recover punitive damages in this case, requires a finding by you of a wanton disposition, grossly irresponsi-

---

**14.** *Eagle–Picher Industries, Inc., et al. v. Balbos, et al.* (No. 22, Sept. Term 1991); *Owens–Illinois, Inc. v. Armstrong, et al.* (No. 77, Sept. Term 1991).

ble to the rights of others, extreme recklessness and utter disregard for the rights of others."

Similarly, the Court of Special Appeals evaluated the evidence and stated that in order to affirm a punitive damages award,

"[w]e ... require a showing that the defendant conducted itself 'in an extraordinary manner characterized by a wanton and reckless disregard for the rights of others.'"

*MCIC, Inc. v. Zenobia,* 86 Md.App. 456, 466, 587 A.2d 531, 536 (1991), quoting *Eagle–Picher v. Balbos,* 84 Md.App. 10, 73, 578 A.2d 228, 259 (1990), *cert. granted,* 322 Md. 737, 589 A.2d 968 (1991). Each court required the plaintiffs to show by a preponderance of evidence that the defendants acted with "implied" rather than "actual" malice. That is, the plaintiffs were not required to show that the defendants' conduct was characterized by evil motive, intent to injure, fraud, or actual knowledge of the defective nature of the products coupled with a deliberate disregard of the consequences. Instead, the plaintiffs were required to show only that the defendants' conduct was grossly negligent.

The standard applied by the trial court and the Court of Special Appeals results from, and consequently requires re-examination of, some of the decisions of this Court relating to punitive damages. That re-examination involves two separate rulings by this Court over the past twenty years. First, the injuries of the plaintiffs are surrounded by "contractual" relationships, *e.g.,* the employment contract, the contracts to produce/supply asbestos, etc. Consequently, these cases call into question the validity of this Court's holdings in *H & R Block v. Testerman,* 275 Md. 36, 338 A.2d 48 (1975), and *Wedeman v. City Chevrolet,* 278 Md. 524, 366 A.2d 7 (1976), that, when a contract is involved, the standard for an award of punitive damages differs depending on whether the tortious conduct occurs before or after the contract. Second, these cases challenge the application of the implied malice standard of *Smith v. Gray Concrete Pipe Co., supra,* to a negligence or other non-intentional tort case.

## A.

For the reasons set out more fully in the opinion of Judges Eldridge, Cole and Chasanow in *Schaefer v. Miller, supra,* 322 Md. at 312–322, 587 A.2d at 498–509, we abandon the "arising out of contract" distinction drawn in *H & R Block v. Testerman, supra, Wedeman v. City Chevrolet, supra,* and their progeny, for the purposes of allowing an award of punitive damages in tort cases. Under the *Testerman–Wedeman* rule, where a contractual relationship existed, the basic standard for exposure to punitive damage liability would vary depending on whether the wrongful conduct took place before or after the formation of the contract. The *Testerman–Wedeman* principle required that, if the wrongful conduct constituting the basis for a punitive damages claim occurred after the formation of a contract, the plaintiff must prove actual malice in order for the jury to consider an award of punitive damages, but if the wrongful conduct occurred before the formation of a contract, punitive damages were allowable upon a showing of "implied" malice. *H & R Block v. Testerman, supra,* 275 Md. at 46–47, 338 A.2d at 54; *Wedeman v. City Chevrolet, supra,* 278 Md. at 532, 366 A.2d at 13.[15]

---

15. Defective product actions, "[i]n a very real sense, ... arise out of a contractual relationship." *American Laundry Mach. v. Horan,* 45 Md.App. 97, 116, 412 A.2d 407, 419 (1980). Despite this statement in the first Court of Special Appeals case to consider punitive damages in a defective product negligence action, the Court of Special Appeals has consistently held that implied malice will suffice to support an award of punitive damages in a products liability case. *See MCIC, Inc. v. Zenobia,* 86 Md.App. 456, 466, 587 A.2d 531, 536 (1991); *Owens–Illinois v. Armstrong,* 87 Md.App. 699, 719, 591 A.2d 544, 553, *cert. granted,* 324 Md. 90, 595 A.2d 1077 (1991); *Eagle–Picher v. Balbos,* 84 Md.App. 10, 72–73, 578 A.2d 228, 259 (1990), *cert. granted,* 322 Md. 737, 589 A.2d 968 (1991); *Harley–Davidson Motor Co., Inc. v. Wisniewski,* 50 Md.App. 339, 437 A.2d 700 (1981), *cert. denied,* 292 Md. 596 (1982); *American Laundry Mach. v. Horan, supra.*

In *American Laundry Mach. v. Horan, supra,* 45 Md.App. at 116, 412 A.2d at 419, the Court of Special Appeals reasoned that because the contract was not one between the party injured and the manufacturer of the product, the tort did not "arise out of a contract" and that the "standard to be applied, therefore, is not that stated in *Testerman,* but rather the 'legal equivalent' implied malice standard normally applica-

"[T]he purposes of punitive damages relate entirely to the nature of the defendant's conduct." *Schaefer v. Miller, supra,* 322 Md. at 321, 587 A.2d at 503. Whether the tort occurred before or after the formation of a contractual relationship should not determine whether actual or implied malice is required for allowing an award of punitive damages. Rather, the availability of a punitive damages award ought to depend upon the heinous nature of the defendant's tortious conduct. *Schaefer,* 322 Md. at 321–322, 587 A.2d at 503. *See, e.g., Vancherie v. Siperly,* 243 Md. 366, 373–374, 221 A.2d 356, 360 (1966); *McClung-Logan v. Thomas,* 226 Md. 136, 148, 172 A.2d 494, 500 (1961); *Davis v. Gordon, supra,* 183 Md. at 133–134, 36 A.2d at 701; *Heinze v. Murphy,* 180 Md. 423, 431–432, 24 A.2d 917, 921–922 (1942); *Nichols v. Meyer,* 139 Md. 450, 457, 115 A. 786, 788 (1921); *Baltimore and Ohio R.R. Co. v. Boyd,* 63 Md. 325, 334–335 (1885).

■ Awarding punitive damages based upon the heinous nature of the defendant's tortious conduct furthers the historical purposes of punitive damages—punishment and deterrence. *Schaefer v. Miller, supra,* 322 Md. at 321, 587 A.2d at 503; *Embrey v. Holly,* 293 Md. 128, 142, 442 A.2d 966, 973 (1982); *First Nat'l Bank v. Fid. & Dep. Co.,* 283 Md. 228, 232, 389 A.2d 359, 361 (1978). Thus, punitive damages are awarded in an attempt to punish a defendant whose conduct is characterized by evil motive, intent to injure, or fraud, and to warn others contemplating similar conduct of the serious risk of monetary liability.

Because the *Testerman–Wedeman* distinction focuses on when the conduct occurred rather than on the nature of the conduct, it has no relationship to the purposes of punitive damages. Furthermore, the " 'arising out of contractual relations' rule formulated in *Testerman* and *Wedeman* had no support in the Maryland cases relied on in the *Tester-*

---

ble in tort cases." *Ibid.* Because of the approach we take in this case, we need not express any view concerning this reasoning by the Court of Special Appeals.

*man* and *Wedeman* opinions." *Schaefer v. Miller, supra,* 322 Md. at 316, 587 A.2d at 501. As more fully set out in *Schaefer,* 322 Md. at 322–323, 587 A.2d at 504, the *Testerman–Wedeman* rule has led to irrational results and its application has been inconsistent.

The irrational and inconsistent application of a punitive damages standard undermines the objective of deterrence because persons cannot predict, and thus choose to abstain from, the type of behavior that is sanctioned by a punitive damages award. Consequently we abandon the "arising out of a contract" distinction "and return to the principles relating to punitive damages which had prevailed in this State for many, many years before *Testerman*." *Schaefer v. Miller, supra,* 322 Md. at 327, 587 A.2d at 506.

### B.

In the years before *Testerman*, this Court had articulated two standards governing an award of punitive damages in non-intentional tort cases. The test that applied prior to 1972 was that "punitive damages were not recoverable in negligence actions absent actual malice or similar wrongful motive. They were not recoverable on an implied malice basis no matter how gross, reckless, or wanton the defendant's conduct might be." *Schaefer v. Miller, supra,* 322 Md. at 327, 587 A.2d at 506. Although articulated in various ways, the so called "actual malice" standard was explained in an earlier case as follows:

"[T]o entitle one to such damages there must be an element of fraud, or malice, or evil intent ... entering into and forming part of the wrongful act. It is in such cases as these that exemplary or punitive damages are awarded as a punishment for the evil motive or intent with which the act is done, and as an example or warning to others."

*Philadelphia, W. & B.R. Co. v. Hoeflich,* 62 Md. 300, 307 (1884). *See, e.g., Davis v. Gordon, supra,* 183 Md. at 133, 36 A.2d at 701 (in negligence cases, punitive damages are

awarded as a punishment for evil motive or intent); *Heinze v. Murphy, supra,* 180 Md. at 429–431, 24 A.2d at 921 ("fraud, malice, or evil intent" is required).

In *Davis v. Gordon, supra,* this Court refused to adopt an implied malice standard for the allowance of punitive damages in a negligence action and held that there must be "actual malice." In reaching this conclusion, the Court analyzed whether the adoption of an implied malice standard would serve the deterrent and penal objectives of punitive damages. 183 Md. at 133, 36 A.2d at 701. Because the implied malice standard would not further either objective of punishment or deterrence, it was rejected.

In 1972 this Court, for the first time in a non-intentional tort action, allowed an award of punitive damages based upon implied malice. *Smith v. Gray Concrete Pipe Co., supra.* The Court in *Smith* relied upon out-of-state authority to allow the plaintiff to recover punitive damages upon a showing that the defendant was guilty of "gross negligence," which was defined as a "wanton or reckless disregard for human life." *Smith,* 267 Md. at 167, 297 A.2d at 731.[16] The *Smith* opinion did not attempt to analyze how this newly established "gross negligence" standard would promote the objectives of punitive damages.

The gross negligence standard has led to inconsistent results and frustration of the purposes of punitive damages in non-intentional tort cases. *Schaefer v. Miller, supra,* 322 Md. at 332, 587 A.2d at 508. Such a possibility was foreseen by the *Smith* Court, as the majority in *Smith* expressed concern that a test requiring "wanton" conduct or "reckless disregard of the rights of others" presented "the danger of . . . a test which may be so flexible that it can become virtually unlimited in its application." *Smith v. Gray Concrete Pipe Co., supra,* 267 Md. at 166, 297 A.2d at

---

**16.** Judge Marvin Smith, dissenting in *Smith v. Gray Concrete Pipe Co., supra,* 267 Md. at 173–174, 297 A.2d at 734–735, discussed the inconsistency between the majority's opinion and earlier Maryland cases, including *Davis v. Gordon, supra.*

731. Despite the *Smith* Court's limitation of the implied malice standard to torts involving the operation of motor vehicles, the standard has been freely applied to other nonintentional torts. *See, e.g., Exxon Corp. v. Yarema,* 69 Md.App. 124, 516 A.2d 990 (1986), *cert. denied,* 309 Md. 47, 522 A.2d 392 (1987); *Medina v. Meilhammer,* 62 Md.App. 239, 489 A.2d 35, *cert. denied,* 303 Md. 683, 496 A.2d 683 (1985); *American Laundry Mach. v. Horan,* 45 Md.App. 97, 412 A.2d 407 (1980). *See also Liscombe v. Potomac Edison Co.,* 303 Md. 619, 637, 495 A.2d 838, 847 (1985) (assuming, without deciding, that the *Smith* holding was applicable to non-intentional torts not involving the operation of motor vehicles).

In the face of "a literal explosion of punitive damage law and practice,"[17] many states have acted to define more accurately the type of conduct which can form the basis for a punitive damages award. In *Tuttle v. Raymond,* 494 A.2d 1353 (Me.1985), the Supreme Judicial Court of Maine reviewed its law on punitive damages. The implied malice standard applied by the lower courts in *Tuttle* allowed recovery of punitive damages upon a showing that the defendant's conduct was "wanton, malicious, reckless or grossly negligent." 494 A.2d at 1360. The court rejected this standard, stating (494 A.2d at 1361):

> " 'Gross' negligence simply covers too broad and too vague an area of behavior, resulting in an unfair and inefficient use of the doctrine of punitive damages.... A similar problem exists with allowing punitive damages based merely upon 'reckless' conduct. 'To sanction punitive damages solely upon the basis of conduct characterized as heedless disregard of the consequences would be to allow virtually limitless imposition of punitive damages.' "

The Maine court went on to point out that the implied malice standard "overextends the availability of punitive

---

17. 2 J. Ghiardi and J. Kircher, *Punitive Damages Law and Practice* § 21.01, at 2 (1985).

damages" and consequently "dulls the potentially keen edge of the doctrine as an effective deterrent of truly reprehensible conduct." *Ibid. See also Rawlings v. Apodaca,* 151 Ariz. 149, 162, 726 P.2d 565, 578 (1986) ("We do not believe that the concept of punitive damages should be stretched. We restrict its availability to those cases in which the defendant's wrongful conduct was guided by evil motives"); *Preston v. Murty,* 32 Ohio St.3d 334, 335, 512 N.E.2d 1174, 1175–1176 (1987) ("this [recklessness] is the type of malice which has remained frustratingly vague . . . a positive element of wrongdoing is always required"); *Lee v. Bank of America,* 218 Cal.App.3d 914, 920, 267 Cal.Rptr. 387, 390 (2d Dist.1990) (gross negligence or recklessness is not enough); *First Interstate Bank of Nevada v. Jafbros Auto Body Inc.,* 106 Nev. 54, 56–57, 787 P.2d 765, 767 (1990) (without substantial evidence of oppression, fraud, or malice, even unconscionable irresponsibility will not support a punitive damages award).[18]

As previously indicated, arbitrary and inconsistent application of the standard for awarding punitive damages frus-

---

**18.** *See* American College of Trial Lawyers, *Committee Report on Punitive Damages,* at 6 and n. 23 (1989):

"[I]t appears that the law is evolving in many jurisdictions to require that there be some conscious indifference to the rights of others before punitive damages are warranted.

\* \* \* \* \* \*

"*See, e.g., Rawlings v. Apodaca,* 151 Ariz. 149, 726 P.2d 565 (1986); *Freeman v. Anderson,* 279 Ark. 282, 651 S.W.2d 450 (1983); *Jardel v. Hughes,* 523 A.2d 518 (Del.1987); *Tuttle v. Raymond, supra,; Preston v. Murty,* 32 Ohio St.3d 334, 512 N.E.2d 1174 (1987); *Enright v. Lubow,* 202 N.J.Super. 58, 493 A.2d 1288 (App.Div.1985)."

The Committee recommended, at 12, that the following standards be used:

"[P]ermitting punitive awards based merely on different degrees of carelessness or inadvertent conduct exacerbates the already difficult problem of articulating a clear standard to be employed by the trier of fact and for review on appeal. Thus, the logical and practical line of demarcation should be drawn at the point where the defendant realizes that his or her conduct will, or that there is a strong probability that it may, cause the resulting harm. Conduct, such as extreme carelessness, which does not involve this basic element of consciousness should not be the subject of punitive damages."

trates the dual purposes of punishment and deterrence. Implied malice as that term has been used, with its various and imprecise formulations, fosters this uncertainty. As pointed out by Professor Ellis, (D. Ellis, *Fairness and Efficiency in the Law of Punitive Damages*, 56 S.Cal. L.Rev. 1, 52–53 (1982)):

"[T]he law of punitive damages is characterized by a high degree of uncertainty that stems from the use of a multiplicity of vague, overlapping terms.... Accordingly, there is little reason to believe that only deserving defendants are punished, or that fair notice of punishable conduct is provided."

*See also* D. Owen, *Punitive Damages in Products Liability Litigation*, 74 Mich.L.Rev. 1257, 1283 n. 135 (1976) ("any definition of the punishable conduct, such as marketing a product in 'reckless,' 'wanton,' or 'flagrant' disregard of the public safety will necessarily be quite vague"); J. Henderson and A. Twerski, *Doctrinal Collapse in Products Liability: The Empty Shell of Failure to Warn*, 65 N.Y.U.L.Rev. 265, 290 (1990); D. Owen, *Problems in Assessing Punitive Damages Against Manufacturers of Defective Products, supra,* U.Chi.L.Rev. at 23 ("reckless" standard exposes the defendant to punitive damages liability even if the decision was made in good faith).

The implied malice test adopted in *Smith v. Gray Concrete Pipe Co.* has been overbroad in its application and has resulted in inconsistent jury verdicts involving similar facts. It provides little guidance for individuals and companies to enable them to predict behavior that will either trigger or avoid punitive damages liability, and it undermines the deterrent effect of these awards.[19]

---

19. *See* 2 L. Schlueter and K. Redden, *Punitive Damages,* Appendix B, at 418–419 (2nd ed. 1989), explaining:

"Punitive damage awards can only affect behavior if an actor is able to conform to established standards of conduct. If the standards are constantly changing, the actor may be unable to predict accurately the line that separates desirable from undesirable conduct. A potential defendant will either become too cautious, refusing to

Therefore, we overrule *Smith v. Gray Concrete Pipe Co.* and its progeny, including *Nast v. Lockett,* 312 Md. 343, 539 A.2d 1113 (1988). In a non-intentional tort action, the trier of facts may not award punitive damages unless the plaintiff has established that the defendant's conduct was characterized by evil motive, intent to injure, ill will, or fraud, *i.e.,* "actual malice." [20] *See Davis v. Gordon, supra,* 183 Md. at 133, 36 A.2d at 701.[21]

## C.

"Actual malice," defined above as conduct of the defendant characterized by evil motive, intent to injure, ill will, or fraud, does not translate easily into products liability cases.

---

engage in socially beneficial behavior or will follow a course of behavior that imposes more harm on society than benefit."

*Accord* D. Owen, *The Moral Foundation of Punitive Damages,* 40 Ala.L.Rev. 705, 729 (1989); E. Elliott, *Why Punitive Damages Don't Deter Corporate Misconduct Effectively,* 40 Ala.L.Rev. 1053, 1057–1060, 1065 (1989); D. Owen, *Problems in Assessing Punitive Damages Against Manufacturers of Defective Products,* 49 U.Chi.L.Rev. 1, 22–23, 47–49 (1982).

**20.** We recognize that the term "actual malice" has meant different things in the law, that its popular connotation may not always be the same as its legal meaning, and that its use has been criticized. *See, e.g., Masson v. New Yorker Magazine, Inc.,* —— U.S. ——, ——, 111 S.Ct. 2419, 2430, 115 L.Ed.2d 447, 469 (1991); *Hart–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 666 n. 7, 109 S.Ct. 2678, 2685, 105 L.Ed.2d 562, 576 (1989); *Ross v. State,* 308 Md. 337, 340 n. 1, 519 A.2d 735, 736 n. 1. Nevertheless, we simply use the term in this opinion as a shorthand method of referring to conduct characterized by evil motive, intent to injure, ill will, or fraud. In instructing juries with respect to punitive damages, however, it would be preferable for trial judges not to use the term "actual malice."

**21.** The scope of this opinion primarily encompasses the standard of conduct which will support an award of punitive damages in so called non-intentional tort cases, *i.e.* negligence and strict liability cases. In addition, our overruling of the *Testerman–Wedeman* "arising out of contract" principle is applicable to all tort actions. We shall not at this time, however, reconsider or modify the legal principles concerning the type of conduct which will support an award of punitive damages in so-called intentional tort actions, *i.e.,* tort actions other than negligence and strict liability. To some extent, the applicable legal principles are reviewed in *Schaefer v. Miller,* 322 Md. 297, 319–320, 587 A.2d 491, 502–503 (1991).

"Products liability" actions are those cases in which the cause of action arises from an injury caused by a defective product. The theories of liability in such cases are negligence, strict liability and breach of warranty.[22] As we held in Part B above, in ordinary non-intentional tort cases, the plaintiff must prove that the defendant's conduct was characterized by an evil motive or intent to injure, or defraud the plaintiff. *Davis v. Gordon, supra,* 183 Md. at 133, 36 A.2d at 701. Nevertheless, it is not likely that a manufacturer or supplier of a defective product would specifically intend to harm a particular consumer. We agree with the academic commentary and the courts that "[t]he manufacturer of a defective product operating in vastly different circumstances, . . . will require a unique description of what specific conduct will render it liable for punitive damages." 2 Ghiardi and Kircher, *Punitive Damages Law and Practice, supra,* § 6.04 at 12. Some form of "knowledge" of a defect and a subsequent disregard of the danger are required for allowing an award of punitive damages in most jurisdictions. After a survey of the cases, Ghiardi and Kircher state (§ 6.21 at 98):

"In summary, case law establishes that a defendant must have specific knowledge of a product's defect and its potential for harm before an exemplary award is appropriate. This knowledge is usually gained through defendant's testing procedures before marketing or through postmarketing consumer accident reports and complaints received by the defendant."

*See, e.g., Donahue v. Phillips Petroleum Co.,* 866 F.2d 1008, 1013–1014 (8th Cir.1989) (applying Missouri law); *Fell*

---

**22.** In Maryland a breach of warranty suit is a contract action. *See Nissen Corp. v. Miller,* 323 Md. 613, 619, 594 A.2d 564, 567 (1991); *Frericks v. General Motors Corp.,* 278 Md. 304, 307, 363 A.2d 460, 461 (1976); *Frericks v. General Motors Corp.,* 274 Md. 288, 299, 336 A.2d 118, 125 (1975); *Volkswagen of America v. Young,* 272 Md. 201, 220, 321 A.2d 737, 747 (1974). Therefore, like any other contract action, punitive damages are not recoverable under a breach of warranty count.

*v. Kewanee Farm Equipment Co., supra,* 457 N.W.2d at 919–920.

■■■ We believe that in products liability cases the equivalent of the "evil motive," "intent to defraud," or "intent to injure," which generally characterizes "actual malice," is actual knowledge of the defect and deliberate disregard of the consequences. Therefore, in order for actual malice to be found in a products liability case, regardless of whether the cause of action for compensatory damages is based on negligence or strict liability, the plaintiff must prove (1) actual knowledge of the defect on the part of the defendant, and (2) the defendant's conscious or deliberate disregard of the foreseeable harm resulting from the defect.

■■■ The knowledge component, which we hold is necessary to support an award of punitive damages, does *not* mean "constructive knowledge" or "substantial knowledge" or "should have known." More is required to expose a defendant to a potential punitive damages award. The plaintiff must show that the defendant *actually* knew of the defect and of the danger of the product at the time the product left the defendant's possession or control.[23] *See Sch. Dist. of Independence v. U.S. Gypsum,* 750 S.W.2d 442, 446 (Mo.App.1988) ("No Missouri case has permitted submission of punitive damage claim in a strict products liability case on the theory that the defendant should have known of a dangerous defect in its product").[24]

---

**23.** Actual knowledge, however, does include the wilful refusal to know. *See, e.g., State v. McCallum,* 321 Md. 451, 458–461, 583 A.2d 250, 253–255 (1991) (Chasanow, J., concurring) (" '[K]nowledge' exists where a person believes that it is probable that something is a fact, but deliberately shuts his or her eyes or avoids making reasonable inquiry with a conscious purpose to avoid learning the truth.") Therefore, a defendant cannot shut his eyes or plug his ears when he is presented with evidence of a defect and thereby avoid liability for punitive damages.

**24.** For cases involving instances where the plaintiffs demonstrated the actual knowledge required, *see, e.g., Fischer v. Johns–Manville Corp.,* 103 N.J. 643, 672, 512 A.2d 466, 481 (1986) ("the evidence supports a finding that Johns–Manville knew of the dangers created by its prod-

■ Furthermore, the plaintiff is required to show that, armed with this actual knowledge, the defendant consciously or deliberately disregarded the potential harm to consumers. Professor Owen suggests the term "flagrant indifference." D. Owen, *Punitive Damages in Products Liability Litigation, supra,* 74 Mich.L.Rev. at 1369. We prefer the characterization "conscious or deliberate disregard," and emphatically state that negligence alone, no matter how gross, wanton, or outrageous, will not satisfy this standard. Instead the test requires a bad faith decision by the defendant to market a product, knowing of the defect and danger, in conscious or deliberate disregard of the threat to the safety of the consumer.

### D.

■ The defendant Owens–Illinois and several amici argue that a theory of strict liability in tort is inconsistent with an award of punitive damages because strict liability by its nature does not require a showing of fault, and an award of punitive damages requires fault to be valid. Although a few commentators have endorsed this argument,[25] the majority of courts which have considered the issue have found no logical inconsistency in allowing a punitive damages award in a strict liability action. *See Sturm, Ruger & Co., Inc. v. Day,* 594 P.2d 38, 46–47 (Alaska 1979), *cert.*

---

uct. Not only did it fail to warn users of the serious health hazards associated with exposure to asbestos, it actually took affirmative steps to conceal this information from the public"); *Tetuan v. A.H. Robins Co.,* 241 Kan. 441, 484, 738 P.2d 1210, 1240 (1987) ("Far from simply being 'grossly negligent' in marketing the Dalkon Shield, there was substantial evidence to conclude that Robins deliberately, intentionally, and actively concealed the dangers of the Shield for year after year").

**25.** *See, e.g.,* 2 Ghiardi and Kircher, *Punitive Damages Law and Practice, supra,* § 6.01 at 2–5; F. Tozer, *Punitive Damages and Products Liability,* 39 Ins. Counsel J. 300 (1972). *But see* D. Owen, *Punitive Damages in Products Liability Litigation,* 74 Mich.L.Rev. 1257, 1268–1271 (1976) (where the author systematically raises and rejects each argument concerning the incompatibility of strict liability actions and punitive damages awards).

*denied,* 454 U.S. 894, 102 S.Ct. 391, 70 L.Ed.2d 209 (1981); *Masaki v. General Motors Corp.,* 71 Haw. 1, 9–11, 780 P.2d 566, 571–572 (1989); *Gryc v. Dayton–Hudson Corp.,* 297 N.W.2d 727, 732 (Minn.), *cert. denied sub nom. Riegel Textile Corp. v. Gryc,* 449 U.S. 921, 101 S.Ct. 320, 66 L.Ed.2d 149 (1980); *Fischer v. Johns–Manville Corp.,* 103 N.J. 643, 652–654, 512 A.2d 466, 470–471 (1986); *Home Ins. Co. v. American Home Products,* 75 N.Y.2d 196, 204, 551 N.Y.S.2d 481, 486, 550 N.E.2d 930, 935 (1990); *Wangen v. Ford Motor Co.,* 97 Wis.2d 260, 270, 294 N.W.2d 437, 443 (1980); *Fleet & Semple v. Hollenkemp,* 52 Ky. 219, 225–226 (1852) (first case recognizing punitive damages in strict liability and rejecting the argument that they are inconsistent). *See also* cases cited in R. Lockwood, Annotation, *Allowance of Punitive Damages in Products Liability Case,* 29 A.L.R.3d 1021, 1022 (1970) and Supplemental Cases. *But see Scott v. Fruehauf Corp.,* 302 S.C. 364, 370, 396 S.E.2d 354, 357 (1990); *Butcher v. Robertshaw Controls Co.,* 550 F.Supp. 692, 705 (D.Md.1981); *Doe v. Miles Laboratories, Inc.,* 675 F.Supp. 1466, 1481 (D.Md.1987), *aff'd,* 927 F.2d 187 (4th Cir.1991).

The plaintiffs before trial in these cases dismissed all theories of liability except for strict liability. Thus, as stated in Part I, in order to recover compensatory damages under a strict liability theory, the plaintiffs were required to prove:

"(1) [that] the product was in a defective condition at the time it left the possession or control of the seller;

(2) that it was unreasonably dangerous to the user or consumer;

(3) that the defect was a cause of the injuries;

(4) that the product was expected to and did reach the consumer without substantial change in its condition."

*Phipps v. General Motors Corp., supra,* 278 Md. at 344, 363 A.2d at 958. In addition, for the reasons set forth in Part I of this opinion, a "knowledge" or "state of the art" element is pertinent in a strict liability case based on a failure to warn. While the cause of action does not require

a showing of any particular intent or actual knowledge, it also does not require the plaintiff to negate an evil intent or actual knowledge of a defect and deliberate disregard of the consequences. Therefore the elements of a strict liability claim are not inconsistent with evidence of evil intent or wrongdoing offered to support a punitive damages award.

It is true that the evidence necessary to support a punitive damages award goes far beyond that required to support a compensatory damages award based on the underlying strict liability claim. In the same manner, the evidence of actual malice that will support a punitive damages award in a products liability action based on negligence requires the plaintiff to prove much more than negligence. The defendant Owens–Illinois does not argue, however, that there is an inconsistency between a negligence cause of action and punitive damages. The showing of actual malice required for a punitive damages award is the same regardless of whether the plaintiff's claim for compensatory damages was based on strict liability or on negligence. In either case, the evidence must show malicious conduct and not simply the supplying of a defective product or negligence.

We agree with the Supreme Court of New Jersey that "[t]he right to recover punitive damages cannot sensibly, in this day and age, be made to turn on the form of the pleading." *Fischer v. Johns–Manville Corp., supra,* 103 N.J. at 658, 512 A.2d at 474. Therefore, punitive damages are recoverable in a strict products liability case in the same manner as they are available in a products liability negligence case.

### E.

 The defendant Owens–Illinois and some amici have argued that, in order for a jury to consider a punitive damages award, a plaintiff should be required to establish by clear and convincing evidence that the defendant's conduct was characterized by actual malice.

The function of the standard of proof is to "allocate the risk of error between the litigants and to indicate the relative importance attached to the ultimate decision." *Addington v. Texas*, 441 U.S. 418, 423, 99 S.Ct. 1804, 1808, 60 L.Ed.2d 323, 329 (1979). Furthermore, the clear and convincing standard has been used

> "in civil cases involving allegations of fraud or some other quasi-criminal wrongdoing by the defendant. The interests at stake in those cases are deemed to be more substantial than mere loss of money and some jurisdictions accordingly reduce the risk to the defendant of having his reputation tarnished erroneously by increasing the plaintiff's burden of proof." *Ibid.*

*See Pacific Mutual Life Ins. Co. v. Haslip, supra,* —— U.S. ——, 111 S.Ct. at 1062, 113 L.Ed.2d at 43 (O'Connor, J., dissenting) ("there is a stigma attached to an award of punitive damages that does not accompany a purely compensatory award. The punitive character of punitive damages means that there is more than just money at stake").

Maryland requires a "clear and convincing evidence" standard of proof in cases of fraud, *First Nat'l Bk. v. U.S.F. & G. Co.*, 275 Md. 400, 340 A.2d 275 (1975), and in attorney disciplinary proceedings, *Bar Ass'n of Baltimore City v. Posner*, 275 Md. 250, 339 A.2d 657, *cert. denied*, 423 U.S. 1016, 96 S.Ct. 451, 46 L.Ed.2d 388 (1975). In *First Nat'l Bk. v. U.S.F. & G. Co., supra*, 275 Md. at 411, 340 A.2d at 283, this Court stated:

> "When fraud, dishonesty or criminal conduct is imputed, something more than a mere preponderance of evidence must be produced; the proof must be 'clear and satisfactory' and be of such a character as to appeal strongly to the conscience of the court."

*See also Everett v. Baltimore Gas & Elec.*, 307 Md. 286, 301, 513 A.2d 882, 890 (1986) ("certain cases require a more exacting standard because of the seriousness of the allegations").

A growing majority of states requires that a plaintiff prove the defendant's malicious conduct by clear and con-

vincing evidence before punitive damages can be considered.[26] Many states have adopted the clear and convincing standard by statute.[27] Other states have adopted the standard by judicial decisions. *See Linthicum v. Nationwide Life Ins. Co.*, 150 Ariz. 326, 332, 723 P.2d 675, 681 (1986); *Masaki v. General Motors Corp., supra*, 71 Haw. 1, 780 P.2d 566; *Travelers Indem. Co. v. Armstrong*, 442 N.E.2d 349 (Ind.1982); *Tuttle v. Raymond, supra*, 494 A.2d at 1363; *Wangen v. Ford Motor Co., supra*, 97 Wis.2d 260, 270, 294 N.W.2d 437, 443.

In *Masaki v. General Motors Corp., supra*, the products liability case arose when the van the plaintiff was repairing "self-shifted" into reverse gear, rendering the plaintiff a quadriplegic. Masaki alleged that the product was defectively designed and manufactured and that he had not been warned of the defect. The case was presented to the jury on negligence, strict liability and breach of warranty theories, and the jury awarded both compensatory and punitive damages. The Supreme Court of Hawaii began its analysis

---

**26.** Adoption of this standard is supported by the academic commentary on the topic of punitive damages as well. *See American College of Trial Lawyers, Committee Report on Punitive Damages, supra*, at 12; D. Ellis, Jr., *Punitive Damages, Due Process, and the Jury*, 40 Ala. L.Rev. 975, 994–995 (1989); M. Wheeler, *The Constitutional Case for Reforming Punitive Damages Procedures*, 69 Va.L.Rev. 269, 298 (1983); D. Owen, *Problems in Assessing Punitive Damages Against Manufacturers of Defective Products, supra*, 49 U.Chi.L.Rev. at 58–59.

**27.** Ala.Code § 6–11–20 (1991 Cum.Supp.); Alaska Stat. § 09.17.020 (1991 Cum.Supp.); Cal.Civ.Code § 3294(a) (West 1992 Cum.Supp.); Ga.Code Ann. § 51–12–5.1 (Michie 1991 Cum.Supp.); Ind.Code Ann. § 34–4–34–2 (Burns 1986); Iowa Code § 668A.1 (West 1987); Kan. Stat.Ann. § 60–3701(c) (1991 Cum.Supp.); Ky.Rev.Stat.Ann. § 411.-184(2) (Michie/Bobbs–Morril 1990 Cum.Supp.); Minn.Stat.Ann. § 549.20 (West 1988); Mont.Code Ann. § 27–1–221(5) (1991); Nev. Rev.Stat. § 42.005(1) (Michie 1991 Cum.Supp.); N.D.Cent.Code § 32–03.2–11 (1991 Cum.Supp.); Ohio Rev.Code Ann. § 2307.80(A) (Anderson 1991); Okla.Stat. tit. 23, § 9 (West 1987); Or.Rev.Stat. § 30.925 (1991); S.C.Code Ann. § 15–33–135 (Law Co-op.1991 Cum. Supp.); S.D.Codified Laws Ann. § 21–1–4.1 (1987); Utah Code Ann. § 78–18–1 (1991 Cum.Supp.).

Colorado requires proof beyond a reasonable doubt to support a punitive damages award. Colo.Rev.Stat. § 13–25–127(2) (1989).

by reviewing the purposes of punitive damages as punishment and deterrence. In order to effect these purposes, "a positive element of conscious wrongdoing is always required. Thus punitive damages are not awarded for mere inadvertence, mistake or errors of judgment." 71 Haw. at 7, 780 P.2d at 571, *citing*, Restatement (Second) of Torts § 908, Comment b. The *Masaki* court then expressed two compelling reasons for adopting a clear and convincing standard, stating (71 Haw. at 16, 780 P.2d at 575):

> "[P]unitive damages are a form of punishment and can stigmatize the defendant in much the same way as a criminal conviction. It is because of the penal character of punitive damages that a standard of proof more akin to that required in criminal trials is appropriate.... A more stringent standard of proof will assure that punitive damages are properly awarded."

Similarly, the Supreme Court of Arizona adopted a clear and convincing evidence standard of proof for punitive damages in *Linthicum v. Nationwide Life Ins. Co., supra,* 150 Ariz. 326, 723 P.2d 675. That court stated (150 Ariz. at 332, 723 P.2d at 681):

> "As this remedy is only to be awarded in the most egregious of cases, where there is reprehensible conduct combined with an evil mind over and above that required for the commission of a tort, we believe it appropriate to impose a more stringent standard of proof."

The Arizona Court reasoned that a loose assessment of punitive damages undermines the "deterrent impact" and thus "becomes onerous not only to defendants but the public as a whole." *Ibid.*

Both the Arizona court and the Hawaii court looked to the Supreme Judicial Court of Maine's opinion in *Tuttle v. Raymond, supra,* 494 A.2d 1353, for guidance. In that action arising out of an automobile accident, the court was urged to abolish the common law allowance of punitive damages in Maine. While the Court refused to abolish common law punitive damages in Maine, it did "redefine and clarify the type of tortious conduct necessary to justify

an award of punitive damages ... and heighten[ed] the standard of proof incumbent on a plaintiff seeking such an award." *Tuttle,* 494 A.2d at 1354. The court imposed a higher burden of proof because, "although punitive damages serve an important function in our legal system, they can be onerous when loosely assessed." 494 A.2d at 1363. The court explained (*Ibid.*):

> "The potential consequences of a punitive damages claim warrant a requirement that the plaintiff present proof greater than a mere preponderance of the evidence. Therefore, we hold that a plaintiff may recover exemplary damages based on tortious conduct only if he can prove by clear and convincing evidence that the defendant acted with malice."

Use of a clear and convincing standard of proof will help to insure that punitive damages are properly awarded. We hold that this heightened standard is appropriate in the assessment of punitive damages because of their penal nature and potential for debilitating harm. Consequently, in *any* tort case a plaintiff must establish by clear and convincing evidence the basis for an award of punitive damages.

### F.

We now turn to the matter of the effective date of our holdings with respect to punitive damages.

Until today, under Maryland common law a plaintiff in a tort case was required to establish by a preponderance of the evidence those circumstances which would authorize the allowance of an award for punitive damages. By changing this standard of proof to clear and convincing evidence, we have not overruled any particular Maryland cases on the ground that they were wrongly decided at the time. Instead, we have exercised our constitutional authority to change the common law. *See Murphy v. Edmonds,* 325 Md. 342, 362, 601 A.2d 102, 112 (1992); *Julian v. Christopher,* 320 Md. 1, 9–11, 575 A.2d 735, 739 (1990); *Wilder-*

*muth v. State,* 310 Md. 496, 529, 530 A.2d 275, 291–292 (1987); *Ireland v. State,* 310 Md. 328, 331–332, 529 A.2d 365, 366–367 (1987); *Kelley v. R.G. Industries, Inc.,* 304 Md. 124, 140, 497 A.2d 1143, 1150–1151 (1985), and cases there cited.

Recently in *Julian v. Christopher, supra,* 320 Md. at 10–11, 575 A.2d at 739, we reiterated the principle that "[o]rdinarily decisions which change the common law apply prospectively, as well as to the litigants before the court. *Williams v. State,* 292 Md. 201, 217, 438 A.2d 1301, 1309 (1981)." Thus in *Boblitz v. Boblitz,* 296 Md. 242, 275, 462 A.2d 506, 522 (1983), we changed the common law by abrogating interspousal immunity in negligence cases and held that the change was applicable to the case then before the Court and to causes of action accruing after the date of our decision.

Where, however, a change in the common law does not affect the elements of a cause of action but relates to requirements at a trial, we have held that the change applies "to cases where the trials ... commence after the date of our opinion in the present case," *Jones v. State,* 302 Md. 153, 161, 486 A.2d 184, 189 (1985). *See also, e.g., Williams v. State, supra,* 292 Md. at 219, 438 A.2d at 1310; *Lewis v. State,* 285 Md. 705, 716, 404 A.2d 1073, 1079 (1979).

Therefore, the "clear and convincing" standard of proof for punitive damages in tort cases applies to the instant cases, to the other two cases heard by us the same day (Nos. 22 and 77), and to all trials commencing and trials in progress on or after the date this opinion is filed.

 The overruling of both *Smith v. Gray Concrete Pipe Co., supra,* and the "arising out of contract" principle of *H & R Block v. Testerman, supra,* and *Wedeman v. City Chevrolet, supra,* is in a somewhat different category. By overruling those holdings, we are not changing the common law. Rather, for the reasons set forth in this opinion and in *Schaefer v. Miller, supra,* 322 Md. at 312–332, 587 A.2d at 498–509, we have concluded that the *Smith, Testerman* and *Wedeman* holdings were erroneous

and were inconsistent with Maryland common law. Moreover, this Court had not previously decided whether the *Smith* and *Testerman– Wedeman* principles were even applicable to products liability cases.

 When a prior case in this Court is overruled on the ground that it was erroneously decided, the question whether our new holding is retroactive or only prospective is governed by the principles set forth in opinions such as *American Trucking Ass'ns v. Goldstein,* 312 Md. 583, 591–595, 541 A.2d 955, 959–961 (1988); *Potts v. State,* 300 Md. 567, 576–583, 479 A.2d 1335, 1340–1343 (1984); *McClain v. State,* 288 Md. 456, 470, 419 A.2d 369, 375 (1980); *State v. Hicks,* 285 Md. 310, 336–338, 403 A.2d 356, 370–371 (1979); *Wiggins v. State,* 275 Md. 689, 698–716, 344 A.2d 80, 85–95 (majority opinion), 275 Md. at 732–741, 344 A.2d at 104–109 (dissenting opinion) (1975). *See also Linkletter v. Walker,* 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965).

As set forth in the above-cited cases, two major considerations in determining whether a new holding is to be applied only prospectively are the purpose of the holding and the extent of reliance upon the overruled cases. Because the primary purpose of punitive damages is to deter defendants rather than to benefit plaintiffs, the purpose is served by applying today's decision retroactively. Furthermore, this is not a situation where there may have been reliance on the *Smith* case and the *Testerman– Wedeman* principle. A potential tort plaintiff does not in advance plan for or depend upon a particular punitive damages standard in a possible future tort case.

Therefore, our overruling of *Smith* and our overruling the "arising out of contract" principle of *Testerman* and *Wedeman* shall be retroactive as well as prospective. At the same time, however, a defendant in some other case may not complain about a trial court's application of *Smith* or the *Testerman–Wedeman* rule if the defendant failed to object or properly preserve the issue, and if the issue was not raised pursuant to Maryland Rule 8–131(b). *See Murphy v. Edmonds, supra,* 325 Md. at 375, 601 A.2d at 118 (no

party questioned the applicability of the "gross negligence" standard for punitive damages, and the issue was not raised by this Court under Rule 8–131(b); therefore this Court would not apply a different standard); *Boyer v. State*, 323 Md. 558, 581 n. 15, 594 A.2d 121, 132 n. 15 (1991) (same).[28]

## G.

▉▉▉ As pointed out above, the standards for allowing an award of punitive damages, articulated in this opinion, apply to the present cases. Therefore, the new standards govern the plaintiffs' claims for punitive damages against Owens–Illinois.

▉▉▉ As discussed earlier, the punitive damages claims in the present cases were submitted to the jury under an "implied malice" standard. In addition, the jury was not instructed that the standard of proof was clear and convincing evidence. Because the jury was not properly instructed as to the standards for allowing awards of punitive damages, we remand for a new trial of the claims for punitive damages against Owens–Illinois. The parties, of course, are not limited to the same evidence produced at the original trial. Consequently, when all of the evidence in the remand trial on punitive damages is introduced, the trial court must determine, based on the standards articulated today, whether there is sufficient evidence to present the

28. Although we have in this case changed the standard of proof for punitive damages, and overruled the *Smith* case and the "arising out of contract" principle of *Testerman* and *Wedeman,* some of the amici briefs have suggested additional changes in the law regarding punitive damages, such as adoption of the standards discussed in *Pacific Mut. Life Ins. Co. v. Haslip,* —— U.S. ——, —— – ——, 111 S.Ct. 1032, 1044–1046, 113 L.Ed.2d 1, 21–23 (1991), requiring a punitive damages award to bear some relationship to the compensatory damages, requiring a punitive damages award to have some relationship to the plaintiff's costs or harm not covered by compensatory damages (*see* the authorities reviewed in *St. Luke Church v. Smith,* 318 Md. 337, 344–354, 568 A.2d 35, 38–43 (1990)), limiting the admissibility of net worth evidence, and other matters. We shall, however, leave any exploration of these issues for another day.

issue of punitive damages to the jury. If so, the trial court must properly instruct the jury as to the elements which must be shown by the plaintiffs as well as to the standard of proof.[29]

## V.

 The plaintiffs argue that the trial court should not have reduced their awards by deeming that the defendants

---

**29.** Several amicus curiae briefs filed in support of the defendants in these cases present two suggestions concerning trials on the issue of punitive damages.

First they argue that evidence of prior punitive damage awards for the same "course of conduct" should be admissible to mitigate a punitive damages award. They assert that the potential for multiple awards of punitive damages violates the fundamental fairness guaranteed by the Due Process Clause of the Fourteenth Amendment. We do not agree with the argument that a refusal to allow the jury to consider prior awards of punitive damages violates fundamental fairness. Amici make no distinction between those punitive damages awards that are pending on appeal, those that have been reversed and those that have been paid. If an award of punitive damages has in fact been satisfied, the evidence of the defendant's financial means might in some cases reflect that payment. Furthermore, the admission of prior punitive damage awards would require the trial court to conduct a complicated evidentiary proceedings to determine if the defendant had in fact satisfied the punitive judgment. We decline to impose this onerous burden on the trial court.

Second, amici argue that we should impose mandatory bifurcation of the compensatory and punitive damages claims. We note that a trial court may exercise its discretion and bifurcate these issues, pursuant to Maryland Rule 2–503(b). In addition, as frequently occurs in light of Maryland Code (1974, 1989 Repl.Vol.), § 10–913(a) of the Courts and Judicial Proceedings Article (precluding evidence of a defendant's financial means until there has been a finding that punitive damages are supportable under the facts), the trial court will instruct the jury on the compensatory claims and on the defendant's potential liability for punitive damages. Then, once the jury has made a finding of liability on the underlying claims and has determined that there should be liability for punitive damages, the trial court will further instruct the jury concerning the calculation of a punitive damages award. This is precisely the procedure that was followed in these cases.

If there were two separate damages trials in every case, much of the evidence at the trial solely on the issue of punitive damages would duplicate the evidence admitted at the compensatory damages trial. Many of the same witnesses would have to be recalled to repeat their testimony before the jury. In light of the fact that this duplication

were entitled to contribution against Raymark, Inc., and that Anchor Packing Co. was entitled to indemnity against Raymark. Raymark was a manufacturer of asbestos.

Although Raymark was named as a defendant in the original complaint in the *Dickerson* case, this manufacturer settled early with the plaintiff Dickerson. Dickerson later filed an amended complaint, which superseded the original complaint, and which did not name Raymark as a defendant. Raymark also settled early with the plaintiff Zenobia. Raymark was never named as a defendant in the *Zenobia* case, either in the original or in any amended complaint. Sometime after these settlements but before the cross-claims trial, Raymark came under the jurisdiction of the federal bankruptcy court.

As far as the docket entries or record in these cases show, no defendant ever filed a cross-claim expressly against Raymark. Furthermore, the defendants do not in this Court dispute the plaintiffs' assertion that Raymark never had any notice of a cross-claim against it. Instead, the cross-claims in these cases were effected by a cross-claim "stipulation" providing that every defendant named in the original complaint or in an amended complaint

> "stipulate and agree that cross-claims . . . are considered to have been filed by each defendant against each other defendant. Each defendant is considered to have denied the allegations of the cross-claims filed against it."

Because Raymark was never named in the original or an amended complaint in the *Zenobia* case, Raymark could not have entered into this stipulation in the *Zenobia* case. Raymark was not a party to the *Zenobia* case, and no defendant sought to implead Raymark into the *Zenobia* case. *See* Maryland Rule 2–322 requiring service, upon a person not previously a party to the action, of a summons, the complaint, and all pleadings and motions previously filed in the action. The trial court could not exercise jurisdiction to grant a cross-claim against Raymark in the *Zenobia* case.

---

would burden both witnesses and jurors as well as waste judicial resources, we believe that mandatory bifurcation is undesirable.

■ With respect to the *Dickerson* case, the "stipulation" apparently covers the cross-claims against Raymark for contribution because Raymark was named in Dickerson's original complaint. The plaintiff Dickerson argues that the trial court should not have determined that Raymark was a joint tortfeasor because Raymark had filed for bankruptcy protection at the time of the cross-claims trial.

It is not necessary for us to determine, however, whether the trial court violated the automatic bankruptcy stay in granting the cross-claims against Raymark for contribution in the *Dickerson* case, because there was insufficient evidence in that case to find that Raymark was a joint tortfeasor. No evidence was presented against Raymark at the trial on the plaintiffs' claims, presumably because Raymark was not a defendant at that stage. In the cross-claims trial, the only evidence submitted against Raymark was the deposition of an Anchor Packing Co. employee who stated that Anchor bought sixty to seventy-five percent of its asbestos containing products from Raymark. There was no evidence presented at either trial regarding (1) the plaintiff Dickerson's exposure to Raymark's products, (2) whether Raymark's products were a substantial factor in causing the plaintiff Dickerson's injuries, or (3) whether Raymark failed to warn the plaintiff Dickerson of the dangers in its products. In order for Raymark to be adjudicated a joint tortfeasor, the defendants seeking contribution must prove each of the elements that the plaintiff is required to prove. There was simply no such evidence in the *Dickerson* case.

Therefore, the granting of the cross-claims against Raymark in both the *Dickerson* and the *Zenobia* cases are reversed. On remand the compensatory awards must be adjusted to reflect the reversal of the cross-claim adjudication of Raymark as a joint tortfeasor. For this reason the judgments for compensatory damages must be vacated.

JUDGMENT OF THE COURT OF SPECIAL APPEALS VACATED, AND CASES REMANDED TO THE COURT OF SPECIAL APPEALS WITH DIRECTIONS TO VACATE THE JUDGMENTS OF THE CIRCUIT COURT FOR

BALTIMORE CITY AND REMAND THE CASES TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. PLAINTIFFS TO PAY ONE-THIRD OF THE COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS AND DEFENDANTS OWENS-ILLINOIS, INC., MCIC, INC., ANCHOR PACKING CO. AND PORTER HAYDEN COMPANY, TO PAY TWO-THIRDS OF THE COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS.

MOTION FOR RECONSIDERATION DENIED.*

McAULIFFE, Judge, concurring.

I join in all except Part IV of the Court's opinion. With respect to Part IV, I concur in the result. I agree that we should abandon the "arising out of a contract" distinction discussed in Part IV A of the Court's opinion and that we should adopt the "clear and convincing" standard of proof for the award of punitive damages in any case. Moreover, I agree with the specific test adopted by the Court for the availability of punitive damages in a products liability case.

I write separately only to point out that although the Court's opinion makes clear that "actual knowledge of the defect and deliberate disregard of the consequences" will be considered the equivalent of "evil motive," "intent to defraud," or "intent to injure" and therefore within the definition of "actual malice" in products liability cases, Court's opinion at 461, 601 A.2d at 653 it does not state whether an "equivalent" state of mind will be recognized in other non-intentional torts. The Court's opinion should not, I suggest, be interpreted as excluding that possibility.

There is a state of mind that falls just short of an intent to injure, but is sufficiently egregious to be treated as the

---

* The addendum to this opinion denying Motion for Reconsideration can be found at 325 Md. 665 and 602 A.2d 1182.

legal equivalent of an intent to injure for criminal as well as civil purposes. Judge Moylan, writing for the Court of Special Appeals in *DeBettencourt v. State*, 48 Md.App. 522, 530, 428 A.2d 479, *cert. denied*, 290 Md. 713 (1981), provides an apt definition:

> It is ... that the willful doing of a dangerous and reckless act with wanton indifference to the consequences and perils involved, is just as blameworthy, and just as worthy of punishment, when the harmful result ensues, as is the express intent to kill itself. This highly blameworthy state of mind is not one of mere negligence.... It is not merely one even of gross criminal negligence.... It involves rather the deliberate perpetration of a knowingly dangerous act with reckless and wanton unconcern and indifference as to whether anyone is harmed or not. The common law treats such a state of mind as just as blameworthy, just as anti-social and, therefore, just as truly murderous as the specific intents to kill and to harm.

More recently, *see Robinson v. State*, 307 Md. 738, 744–46, 517 A.2d 94 (1986).

The Court's test for liability for punitive damages in a products liability case—that the defendant had actual knowledge of the defect and proceeded with a conscious or deliberate disregard of the foreseeable harm resulting from the defect—is the civil analogue of *DeBettencourt*'s "deliberate perpetration of a knowingly dangerous act with reckless and wanton unconcern and indifference as to whether anyone is harmed or not." The Court thereby acknowledges that a mental state sufficiently egregious to support a conviction of murder is sufficiently egregious to support the imposition of punitive damages.

This rationale, defined precisely and shorn of terms which might suggest that a lesser state of mind would suffice, should apply with equal force in all non-intentional tort cases. A person who is actually aware that his action

involves a clear and serious danger of substantial harm to the plaintiff or anyone in the plaintiff's class, and who unreasonably takes such action with flagrant indifference as to whether anyone will be harmed or not, should be liable for punitive damages if his conduct causes the foreseeable harm. This type of outrageous conduct, being just short of intentional harm, warrants such a sanction. Although the requisite conduct and state of mind will often include gross negligence, the test would not be met by a showing of gross negligence alone.

I assume that the Court does no more than to leave this discussion for another day.

ROBERT M. BELL, Judge, concurring and dissenting.

As relevant to this opinion,[1] the Court's opinion today effects a significant, if not, revolutionary, change in Maryland law respecting punitive damages. In one fell swoop, we have modified the law of punitive damages in three respects. First, we have abolished the distinction held to exist, for purposes of determining whether punitive damages may be awarded, between torts "arising out of contract" and those that do not, overruling in the process *H & R Block v. Testerman*, 275 Md. 36, 338 A.2d 48 (1975) and *Wedeman v. City Chevrolet*, 278 Md. 524, 366 A.2d 7 (1976). In an even greater step, we have followed the trend and held that a new, higher burden of proof henceforth will apply when a party seeks punitive damages. Thus, we have joined the trend of permitting awards of punitive damages only upon greater proof than usually required in civil cases. We made this change in an effort "to insure that punitive damages are properly awarded."

Finally, we reformulated the test for determining whether, in a given case, punitive damages may be awarded. A casualty of that formulation is *Smith v. Gray Concrete Pipe Co.*, 267 Md. 149, 297 A.2d 721 (1972), the case in which "implied malice" was first recognized to be a predicate for the award of punitive damages. Stating the reason

---

**1.** I agree with the Court's opinion except for portions of part IV B. and C., which this opinion addresses.

a new standard is necessary, the majority notes that, when decided, *Smith v. Gray Concrete Pipe Co., supra,* was inconsistent with this Court's precedents and did not attempt to analyze how a "gross negligence" standard promoted the objectives of punitive damages. Furthermore, it says that the *Smith* standard produced "inconsistent results and frustration of the purposes of punitive damages in non-intentional tort cases." The majority asserts that the standard "provides little guidance for individuals and companies to enable them to predict behavior that will either trigger or avoid punitive damages liability, and it undermines the deterrent effect of these awards." (footnote omitted)

In its place, relying on *Davis v. Gordon,* 183 Md. 129, 133, 36 A.2d 699, 701 (1944), the Court adopts, in non-intentional tort cases, a standard of "actual malice," *i.e.* "evil motive," "intent to injure," "ill-will," or "fraud." Because, however, in the usual products liability case, whether proceeding on negligence or strict liability, the sale of the product, defective by virtue of a failure to warn or otherwise, ordinarily will not involve evil motive, conscious intent to injure any particular person, ill will or fraud, we also adopt a variation on the "actual malice" theme: actual knowledge of the defect and conscious or deliberate disregard of the consequences. The majority deems that standard to be the equivalent of "actual malice." But the first prong of that equivalent, the majority is emphatic, must be strictly limited; it means that nothing less than "actual knowledge" will suffice. That there is available evidence about which a defendant "should have known" will not be sufficient to support an award of punitive damages. The most the majority will concede is that, where a "willful refusal to know"—*i.e.,* "where a person believes that it is probable that something is a fact, but deliberately shuts his or her eyes or avoids making reasonable inquiry with a conscious purpose to avoid learning the truth," *see* concurring opinion (Chasanow, J.) in *State v. McCallum,* 321 Md. 451, 458, 583 A.2d 250, 253 (1991), is proven, the person so refusing will be charged with actual knowledge of the product's defect.

Because I share some of the majority's concerns regarding the proliferation of punitive damages claims and their amounts, I join, enthusiastically, with it in adopting two of the changes. I can see no reason for maintaining a distinction, for punitive damages purposes, between torts arising out of a contract and those that do not. Similarly, I believe that requiring proof of punitive damages by clear and convincing evidence is fair and just. Allowing punitive damages to be assessed against a defendant is serious business; it is right that we take steps to insure that it is not viewed lightly. Enhancing the burden of proof to a level commensurate with the seriousness of the matter to be decided is appropriate. I agree with the majority that, because the purpose of punitive damages is, at least in part, to punish, requiring a lower burden of proof for its award is inconsistent with the way we treat other serious cases.

I part company with the majority on the question of what is the appropriate standard for determining the cases in which punitive damages are appropriate. While I have no quarrel with requiring that, in some cases, "actual malice," characterized as "evil motive," "intent to injure", "ill will", "fraud", or, in the case of products liability actions, "actual knowledge of the defective nature of the product, coupled with a deliberate disregard of the consequences", be shown, I am opposed to excising from the standard the concept adopted by *Smith v. Gray Concrete Pipe Company* (267 Md. at 167, 297 A.2d at 731): "wanton or reckless disregard for human life," sometimes characterized as "gross negligence". That standard, now the old one, is a floor, not a ceiling; it sets a minimum requirement, not a maximum. Therefore, if a defendant acts with "actual malice," however, characterized, he or she will be subject to an award of punitive damages under the old standard. On the other hand, by adopting the "actual malice" standard, the majority does much more than excise a useless phrase, it places outside the scope of punitive damages eligibility numerous deserving cases, differing from cases that remain punitive

damages eligible only in the subjective element. That change simply goes too far.

The perception is that more claims for punitive damages, involving conduct so diverse that predictability and, therefore, the ability to choose the proper conduct and avoid being culpable, than were justified, were being brought and allowed with the result that the purposes of punitive damages were being undermined. The changes proposed are for the purpose of making the awards more uniform and consistent with the historical bases for punitive damages awards: punishment and deterrence. The purposes of punitive damages are better served, it has been determined, by requiring a more stringent standard for assessing punitive damages and by requiring a greater burden of proof. To be sure, one of the goals of today's decision is to set a higher threshold for punitive damages eligibility. That is accomplished by changing the burden of proof, that clearly will exclude some undeserving cases, no doubt, a large number, even applying the old standard. But, by both changing the burden of proof and the standard, an even greater percentage of deserving cases, heretofore eligible for punitive damages awards, is affected. Indeed, by so doing, not only is the threshold raised, but excluded is an entire category of cases, non-intentional torts, involving, in many instances, injuries of greater severity than in cases that still qualify and, thus, not necessarily those least deserving of an award of punitive damages. And the distinction causing the exclusion is the subjective intent of the defendant. While I can agree, as I have previously indicated, to raising the threshold by raising the level of the proof required, I cannot agree that punitive damages should be awarded only in cases of "actual malice," where there is a subjective intent element. In cases where there is no actual malice, the totality of the circumstances may reveal conduct on the part of a defendant that is just as heinous as the conduct motivated by that actual malice and, so, for all intents and purposes is the same.

Although not intentional, *i.e.*, willful, conduct, nevertheless, may be outrageousness and extreme in the context in which it occurs, and may produce injuries commensurate with those caused by intentional conduct. In other words, conduct may be so reckless and outrageous as to be the equivalent of intentional conduct. That is precisely what *Smith v. Gray Concrete Pipe Co., supra,* held and the facts as reported in that case justified that pronouncement. It was because the facts were so egregious that the Court was motivated to opine:

> We regard a "wanton or reckless disregard for the human life" in the operation of a motor vehicle, with the known dangers and risks attendant to such conduct, as the legal equivalent of malice. It is a standard which, although stopping short of wilful or intentional injury, contemplates conduct which is of an extraordinary or outrageous character. Yet, it is both a functional and definitive test which, as we have noted, enjoys the virtue of having been frequently applied in this state. And if, as a test, it has been regarded as adequately stringent to serve as a basis for possible imprisonment, then, surely, there appears to be no valid reason for deeming it too liberal for imposing simple sanctions.

267 Md. at 167, 297 A.2d at 731–32.[2]

Permitting punitive damages when one acts with actual malice, but not when, given the totality of the circumstances, that same person acts in total disregard for the safety of others has no reasoned basis.

Consider the following example. A hot water pipe bursts in a crowded apartment complex quite near an open area upon which young people are playing baseball. A repair

---

**2.** The majority makes an extraordinary observation—it suggests that implied malice "provides little guidance for individuals and companies to enable them to predict behavior...." If that is correct, then it is difficult to understand how, for example, manslaughter by motor vehicle, and other, similar crimes, can be upheld since among the purposes of the criminal law, like punitive damages, are punishment and deterrence.

team dispatched to make repairs observes young people playing baseball nearby. It also sees that the area of the affected pipe is in easy reach of a baseball hit to the outfield. Nevertheless, they dig a hole, but, being unable to proceed due to the temperature of the water, suspend operations. Although aware of the young people playing in the area, they leave without warning them of the hole or its contents or in any way marking or obstructing the hole. One of the outfielders, having chased and caught a ball hit to the outfield, falls into the hole and is severely injured.

Under the new standard, if it could be proved that a member of the repair team harbored ill will toward the outfielder and, in the back of his mind, entertained a hope that the outfielder, or one of the other players, would fall in the unattended hole, then, in addition to compensable damages, the outfielder could recover punitive damages. On the other hand, if none of the members of the repair team knew any of the ball players and, in fact, harbored no evil motive at all, no punitive damages could be recovered, notwithstanding that they acted, given the circumstances, in total disregard of the safety of the ballplayers. I can see no reasoned difference between these scenarios.[3] The state of mind of the individual simply is not so important a factor as to permit recovery in one case and not in the other.

I am satisfied that allowing punitive damages for "wanton and reckless conduct," the test enunciated in *Smith,* serves the purposes of punishment and deterrence. Gross negligence, outrageous conduct, etc. cannot be defined in a vacuum. To have meaning, the terms must be viewed in a factual context. The conduct described in the example is not only outrageous and extraordinary, it is the *sine qua non* of reckless conduct. Such conduct should be punished. And that scenario presents a striking example of the kind of conduct a defendant must not engage in if he or she is to avoid paying punitive damages. The example I have prof-

---

**3.** Were the products liability formulation of the standard applied, the case would clearly be a punitive damages eligible case.

fered is not the only one that can be posited. There are hundreds of such cases. The long and short of it is that changing the standard for punitive damages will eliminate numbers of cases, in which, heretofore, punitive damages would have been appropriate and those cases now are eliminated not because their facts are not egregious enough to justify such an award but because other, less serious, and perhaps, undeserving, cases may also qualify for such damages.[4] With all due respect, that is not a sufficiently good reason to change the rules of the game.[5]

Insulating a defendant from an award of punitive damages except when he or she acts with actual malice, meaning with an evil intent, ill will, with intent to injure, or to defraud, provides a disincentive for that defendant to act reasonably. Since, from the standpoint of a defendant's pocketbook, it makes no difference in the award of damages, whether he or she is negligent or grossly negligent, that is, his or her conduct is extreme to a point just short of being intentional, requiring that defendant to pay compensatory damages for the victims's injuries is not likely to

---

**4.** To be sure, in *Davis v. Gordon, supra,* this Court did reject an invitation to assess punitive damages in negligence actions on an implied malice standard; however, in that case, punitive damages would not have been appropriate under any standard. The invitation was accepted in *Smith v. Gray Concrete Pipe Co., supra.* In that case, unlike in *Davis,* rather than deferring to the punitive and deterrent effect of the rules of the road, as opposed to a verdict in a civil case for damages, the Court, in fashioning a standard for the award of such damages, looked to the "usual precedent ... of manslaughter by motor vehicle." 267 Md. at 167, 297 A.2d at 731, "requiring proof of gross negligence, which has been defined in this context as 'a wanton and reckless disregard for human life'." 267 Md. at 167–168, 297 A.2d at 731.

**5.** Just last week, we issued the opinion in the non-economic damages cap case, *Murphy v. Edmonds,* 325 Md. 342, 601 A.2d 102 (1992). The effect of the ruling in that case is to burden the most severely injured victims of accidents, those whose non-economic damages exceed $350,000. *See* dissenting opinion, Chasanow, J., 325 Md. at 378, 601 A.2d at 120. Coming as it does on the heels of that opinion, this opinion, by excluding non-intentional torts from the list of punitive damages eligible cases, continues that trend.

have a deterrent effect; it is not likely to cause him or her to consider, not to mention, change, his or her conduct.

Requiring a high threshold before a products liability case becomes punitive damages eligible presents other problems. Where a prerequisite to being assessed punitive damages is actual knowledge, *i.e.*, whether the defendant actually knows about the product's defect, there is the danger that a defendant will avoid knowledge of that defect rather than keep abreast of developments regarding the product; he or she may decide that the less he or she knows about the product, the better off he or she is. That is particularly true given the strictness of the "actual knowledge" test the Court has formulated.

Notwithstanding the characterization by the majority of the standard applicable to products liability cases as involving "actual malice", even a cursory review of the standard adopted indicates that that simply is not the case. Requiring actual knowledge of the product's defect is but one prong of the test. The other prong, that there be a conscious or deliberate disregard of the foreseeable harm resulting from the defect presents a different situation altogether. That concept is reminiscent of "implied malice" and, more to the point, like "gross negligence" requires definition on a case by case basis. It goes without saying that when an issue is a question for the factfinder, different factfinders will invariably reach different results from the same, or similar, evidence. Consequently, when different factfinders are presented with the same, or similar, evidence, we can anticipate that different results are likely to be reached.

Thus, although couched in terms of a unitary standard, what we really have adopted is a two-prong standard, one applicable to non-intentional torts and the other, containing an aspect quite similar to the standard we have just discarded, applicable to products liability cases. If we can tolerate case by case judicial definition of the requisite conduct in products liability cases, I can see no reason why we cannot continue to do so in non-intentional tort cases. After all, it

is the application of the test, not its formulation, that is critical. Perhaps we should busy ourselves in developing more effective review mechanisms rather than attempting to redefine the conduct that will support punitive damages.